# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Substantively Consolidated Under BKY 13-40789** |
| HUSTAD INVESTMENT CORPORATION, | BKY 13-40789 |
| HUSTAD REAL ESTATE COMPANY, | BKY 13-40786 |
| HUSTAD INVESTMENTS, LP, | BKY 13-40788 |
| Debtors. | Chapter 11 Cases |

## NOTICE OF HEARING AND MOTION TO APPROVE
## THE SALE OF REAL PROPERTY
## FREE AND CLEAR OF INTERESTS

TO:    The entities specified in Local Rule 9013-3

1.    The above named debtors (together, the "Debtor"), through their undersigned attorneys, move the court for the relief requested below and gives notice of hearing.

2.    The court will hold a hearing on this motion at **9:00 a.m. on May 8, 2013** (the "Hearing") before the Honorable Kathleen H. Sanberg, Courtroom 8 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415.

3.    Any response to this motion must be filed and served not later than **May 3, 2013**, which is five (5) days (including Saturdays, Sundays and holidays) before the date set for the hearing.  **Unless a response opposing the motion as to the sale of assets is timely filed, the Court may grant the motion without a hearing.**

4.    This Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334, Bankruptcy Rule 5005 and Local Rule 1070-1.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).  Venue of this proceeding and this Motion is properly in this district pursuant to 28 U.S.C. §§1408 and 1409.

5.     This motion arises under 11 U.S.C. § 363(f) of the Bankruptcy Code, and Fed.R. Bankr.P. 6004 and 9014.

6.     Voluntary petitions under Chapter 11 of the Bankruptcy Code were filed by debtors on February 20, 2013 (the "Petition Date").  The debtors are operating as a Debtor in Possession.

## BACKGROUND

7.     The debtors are engaged in the business of real estate investment.  Among other real property, they are the owners of two development projects: a commercial development with remaining developed lots consisting of 8+/- acres in Eden Prairie, MN called Bluff Country Village, and a mixed-use development consisting of 110+/- acres in Maple Grove, MN (the "Maple Grove Property").  Both Bluff Country Village and the Maple Grove Property are subject to a first mortgage in favor of BMO Harris Bank, N.A. ("BMO") securing a debt of approximately $12.4 million, including principal of approximately $10.8 million, interest, late fees, attorney fees and costs.

8.     Ownership of the properties is split among the debtors.  The majority of Bluff Country Village is owned by Hustad Investment Corporation ("HIC"), but some of that property is owned by Hustad Real Estate Company ("HRE").  The Maple Grove Property is owned by Hustad Investments, LP ("HILP").

9.     On April 3, 2013, the Bankruptcy Court entered an order substantively consolidating these cases into one case (HIC docket no. 47).

10.     The Debtor intends to continue the development and sale of the properties to maximize the value of those assets for the benefit of creditors and equity holders.  The strategy to do so will be integrated and involve staged sales of parcels in both Bluff Country Village and the Maple Grove Property.

11.     A key step in the development of Bluff Country Village is the building of a gasoline station and convenience store to serve as an anchor commercial enterprise in the area. Prior to the filing of these cases, HIC entered into a Letter of Intent ("LOI") with Geller Industries, LLC ("Buyer") regarding the purchase of a parcel of property in Bluff Country Village. A copy of the LOI is attached as **Exhibit A.** The Buyer intends to build and operate a Holiday Stationstore on the property. The property consists of a lot of approximately 68,000 square feet located at U.S. Highway 169 and Pioneer Trail in Eden Prairie, MN (the "Real Property").

## THE PROPOSED SALE

12.     The Debtor seeks authorization from the Court to enter into the Purchase Agreement with the Buyer which is attached to the LOI**.**

13.     Under the Purchase Agreement, the Buyer will purchase the Real Property at closing for a total price of $950,000. The purchase price will be paid by (i) a $10,000 deposit upon signing the Purchase Agreement, (ii) $37,500 in additional deposit on the Contingency Date (defined below), and the balance at Closing (§ 1.2 of the PA).

14.     After the signing of the Purchase Agreement the Debtor and the Buyer must go through a process to obtain necessary approvals for the sale. These items are described in the Buyer's Contingencies section of the Purchase Agreement (§ 5.1). This process will take several months. Thus, the period to accomplish these tasks is set by the Purchase Agreement as 120 days after the date of the Purchase Agreement (the "Contingency Date") (§ 5.1.3).

## SALE IS IN THE INTERESTS OF CREDITORS

15.     The Debtor requests that the sale be approved without further competitive bidding for the Real Property. Prior to the petition date, the debtors engaged in a substantial effort to find the right buyer for the service station site. That process resulted in the LOI. The Debtor believes

that a Holiday Stationstore is the best possible use for the site.  Holiday is one of the industry leaders in the Twin Cities area.  Moreover, the Debtor's research of the market indicates that the $950,000 purchase price is an excellent price for the Real Property.

16.     Consummation of this sale is in the interests of creditors. It will result in the generation of cash to pay down BMO's secured claim and may provide liquidity to pay administrative expenses in this case.    The Debtor requests that BMO's lien transfer to the proceeds of sale and that they be held pending further order of the Court.

## WITNESSES

17.     If necessary, Debtor will call Elisabeth R. Hustad, the President and Chief Executive Officer of Hustad Investment Corporation and Hustad Real Estate Company, which is the sole general partner of Hustad Investments, LP, as a witness in connection with this motion.

WHEREFORE, Debtor requests that the Court enter an Order:

A.  Authorizing the Debtor to enter into the Purchase Agreement;

B.   Authorizing the sale of the Real Property described in the Purchase Agreement free and clear of interests; and

C.  Affording such further relief as the Court deems just and equitable.

Dated:  April 11, 2013              RAVICH MEYER KIRKMAN
                                    McGRATH NAUMAN & TANSEY,
                                    A PROFESSIONAL ASSOCIATION

                                    By  /e/  Michael L. Meyer (72527)
                                            Will R. Tansey (323056)

                                    4545 IDS Center
                                    80 South Eighth Street
                                    Minneapolis, MN 55402
                                    (612) 332-8511

                                    ATTORNEYS FOR DEBTOR

-4-

**VERIFICATION**

I, Elisabeth R. Hustad, the President and Chief Executive Officer of Hustad Investment Corporation and Hustad Real Estate Company, which is the sole general partner of Hustad Investments, LP, declare under penalty of perjury that the facts set forth in the foregoing Notice of Hearing and Motion to Approve the Sale of Real Property Free and Clear of Interests are true and correct according to the best of my knowledge, information and belief.

Executed on:  April __11__, 2013                    _____
                                                    Elisabeth R. Hustad

OCT/30/2012/TUE 09:44 AM   Advanced Imaging Sol      FAX No.                      P. 002

Oct 25 12 08:18a                                                              p.1

## LETTER OF INTENT

Hustad Investment Corporation
10470 White Tail Crossing
Eden Prairie, MN 55347
Attention: Elizabeth Hustad

     RE:   Letter of Intent regarding property located at the intersection of Pioneer Trail and Highway 169, Eden Prairie, Minnesota (the "**Property**").

Dear Beth:

Geller Industries, LLC ("**Purchaser**") is interested in purchasing the Property from Hustad Investment Corporation ("**Seller**") on the terms and conditions of the form of Purchase Agreement attached hereto as **Exhibit A** (the "**Agreement**"). Terms used but not defined in this letter shall have the meanings ascribed to them in the Agreement.

1. Purchaser and Seller shall endeavor to enter into the Agreement within seventy-five (75) days following the date of last execution of this letter of intent. Notwithstanding the foregoing, any execution of the Agreement by Seller and Purchaser is conditioned upon Seller obtaining, within forty-five (45) days of the last execution hereof, a signed consent by Seller's lender, BMO Harris Bank f/k/a M & I Marshall & Ilsley Bank ("**Lender**"), to the transaction contemplated by the Agreement which is satisfactory to Purchaser, in its sole discretion, or, if no such signed consent is obtained, Purchaser otherwise being satisfied, in its sole discretion, that the Mortgage Encumbrances and any and all other liens affecting the Property will be satisfied or released at the closing of the transaction under the Agreement. Any signed consent to the Agreement by Lender must contain the Lender's agreement (a) that upon the closing of the transaction described in the Agreement, the Property shall be transferred to Purchaser free and clear of the Mortgage Encumbrances, and (b) in the event Seller files bankruptcy prior to the Closing, Lender will (i) not contest any motion filed to approve the Agreement, (ii) not overbid the Purchase Price, and (iii) agree to the payment of the Break-Up Fee to Purchaser.

Seller shall use good faith and commercially reasonable efforts to obtain the consent by Lender described in this Section 1 within such forty-five (45) day period. In the event that, within said forty-five (45) day period, the described consent is not obtained, or Purchaser is not otherwise satisfied, in its sole discretion, that the Mortgage Encumbrances and any and all other liens affecting the Property will be satisfied or released at the closing of the transaction under the Agreement, then Purchaser may terminate this letter upon written notice delivered to Seller at the notice addresses provided in the Agreement.

OCT/30/2012/TUE 09:44 AM   Advanced Imaging Sol   FAX No.   P. 003

Oct 25 12 08:18a   p.2

2. Purchaser acknowledges that Seller may become a debtor in a proceeding under Chapter 11 of the United States Bankruptcy Code and that in such event the Agreement, if executed by the parties, would be subject to Bankruptcy Court approval.

3. Seller shall not enter into negotiations for the sale of the Property to any other prospective purchaser of the Property unless Seller and Purchaser have failed to enter into the Agreement within seventy-five (75) days following the date of last execution hereof, in which event either party may terminate this letter upon written notice delivered to the other at the notice addresses provided in the Agreement.

Except for the provisions of Section 3, (a) this letter is intended by Seller and Purchaser to be a non-binding letter that expresses the parties' current intention, (b) neither Seller nor Purchaser shall be legally bound or obligated to negotiate or perform with respect to the subject matter of this letter, under any legal theory, prior to the execution and mutual delivery of the final Agreement, (c) neither Seller nor Purchaser shall make a claim under this letter or a claim against the other based on "part performance", "detrimental reliance", "good faith", "promissory estoppel" or any other similar cause of action, and (d) either party may withdraw from negotiation and/or entry into the final Agreement at any time in such party's sole discretion.

If the foregoing reflects your understanding of our discussions, please indicate such by signing the second copy of this letter in the place indicated and return it to me.

This letter will expire if not accepted and returned to me by October 25, 2012.

Sincerely,

**GELLER INDUSTRIES, LLC**

By: Geller Industries LLC
Name: Grovella
Its:

AGREED AND ACCEPTED THIS 25 DAY OF OCTOBER, 2012

HUSTAD INVESTMENT CORPORATION

By:
Name: Elisabeth R Hustad
Its: President

## EXHIBIT A

## PURCHASE AGREEMENT

## PURCHASE AGREEMENT
### (Eden Prairie, Minnesota)

**THIS PURCHASE AGREEMENT** (this **"Agreement"**) is entered into as of
_____, 2012 (the **"Effective Date"**), by and between **Geller Industries, LLC,** a Minnesota limited liability company (**"Buyer"**), and **Hustad Investment Corporation,** a Minnesota corporation (**"Seller"**).

### RECITALS

A.      Seller is the owner of certain unimproved real property located at the intersection of Pioneer Trail and Highway 169 in Eden Prairie, Minnesota and legally described on <u>Exhibit A</u> attached hereto (the **"Property"**).

B.      Buyer desires to purchase the Property from Seller, and Seller desires to sell the same to Buyer.

**NOW, THEREFORE,** Buyer and Seller agree as follows:

1.      **Sale**.

1.1      **Sale**.  Subject to the terms and provisions of this Agreement, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Property.

1.2      **Purchase Price**.  The purchase price to be paid by Buyer to Seller for the Property shall be Nine Hundred Fifty Thousand and No/100 Dollars ($950,000.00) Dollars (the **"Purchase Price"**), payable as follows: (a) Ten Thousand and No/100 ($10,000.00) Dollars, as initial earnest money, to be paid to First American Title Insurance Company (**"Title"**), within two (2) business days after the Effective Date, to be held in escrow by Title (**"Earnest Money"**, which term shall include the additional earnest money paid pursuant to clause (b) below); (b) if this Agreement is not terminated by Buyer on or before the Contingency Date as it may be extended, Thirty-seven Thousand Five Hundred and No/100 Dollars ($37,500.00), as additional earnest money to be paid to Title on the Contingency Date as it may be extended, and (c) the balance on the Closing Date (as defined in Section 6) subject to those adjustments, prorations and credits described in this Agreement, in cash or certified funds or by wire transfer pursuant to instructions from Seller.

2.      **Available Surveys, Tests, and Reports**.  Within ten (10) days after the Effective Date, Seller shall provide Buyer with a copy of the surveys, soil tests, environmental reports, contracts, other documents and information relating to the Property identified on <u>Exhibit B</u> attached hereto (the **"Due Diligence Materials"**).

Seller shall fully and timely cooperate with Buyer in obtaining reliance letters with respect to the Due Diligence Materials for the benefit of Buyer as Buyer may request.

3.     **Buyer's Investigations.**  At any time following the Effective Date, Seller shall allow Buyer and Buyer's agents access to the Property without charge and at all times for the purpose of Buyer's investigation and testing of the Property, including surveying and testing of soil and groundwater (**"Buyer's Investigations"**).  Upon written request of Seller, Buyer shall provide to Seller copies of all written test results and reports conducted as part of Buyer's Investigations. Buyer agrees to pay all of the costs and expenses associated with Buyer's Investigations, to cause to be released any lien on the Property arising as a result of Buyer's Investigations, to repair and restore, at Buyer's expense, any damage to the Property caused by Buyer's Investigations, and to defend and indemnify Seller and Seller's directors, officers, employees and agents (the "Seller Indemnified Parties") against, and hold the Seller Indemnified Parties harmless from, any and all loss, damage, liability, cost and expense arising out of or related to Buyer's Investigations.  Buyer shall not be responsible for liens, liability, loss, expense or costs arising out of the discovery or presence of Hazardous Substances (as such term is defined in Section 11.1.1) on the Property or otherwise arising out of Seller's noncompliance with any Environmental Law (as such term is defined in Section 11.1.2) or other law or regulation.  The indemnification and other obligations provided in this Section 3 shall survive the termination or cancellation of this Agreement.

4.     **Insurance; Risk of Loss.**  Seller assumes all risk of destruction, loss or damage to the Property prior to the Closing Date.  If, prior to the Closing Date, all or any portion of the Property or access thereto is condemned, taken by eminent domain, or damaged by cause of any nature, or the Property is rendered untenantable, Seller shall immediately give Buyer notice of such condemnation, taking or damage.  After receipt of notice of such condemnation, taking or damage (from Seller or otherwise), Buyer shall have the option (to be exercised within thirty (30) days after Seller's notice) either (a) to require Seller to (i) convey the Property at Closing (as defined in Section 6) to Buyer in its damaged condition, upon and subject to all of the other terms and conditions of this Agreement without reduction of the Purchase Price, (ii) assign to Buyer at Closing all of Seller's right, title and interest in and to any claims Seller may have to insurance proceeds, condemnation awards and/or any causes of action with respect to such condemnation or taking of or damage to the Property or access thereto, and (iii) pay to Buyer at Closing by certified or official bank check all payments made prior to the Closing Date under such insurance policies or by such condemning authorities, or (b) to terminate this Agreement by giving notice of such termination to Seller, whereupon this Agreement shall be terminated, any amount previously paid by Buyer to Seller, including the Earnest Money, shall be refunded to Buyer and thereafter neither party shall have any further rights, obligations or liabilities to the other hereunder.  If the right to terminate this Agreement is not exercised within such thirty (30) day period, such right shall be deemed to have been waived.  Seller shall not designate counsel, appear in, or otherwise act with respect to the condemnation proceedings without Buyer's prior written consent, which consent shall not be unreasonably withheld.

5.    **Contingencies.**

  5.1    **Buyer's Contingencies.**

    5.1.1    Unless waived by Buyer in writing, Buyer's obligation to proceed to Closing shall be subject to (a) performance by Seller of its obligations hereunder, (b) the continued accuracy in all material respects of Seller's representations and warranties provided in Section 9.1, and (c) satisfaction or waiver of the following contingencies:

      5.1.1.1    On or before the Contingency Date (defined below) (without regard to any extensions thereof), Buyer shall have determined, in its sole discretion, that it is satisfied with (a) the results of and matters disclosed by Buyer's Investigations, (b) the acceptability of the Property for use as a 24-hour "Holiday Stationstore" and incidental uses thereto (collectively, the "Proposed Use"), and (c) all other inspections and due diligence regarding the Property, including the contents of the Due Diligence Materials.

      5.1.1.2    On or before the Contingency Date (as it may be extended pursuant to Section 5.1.3), Buyer shall have obtained or there shall have been issued all appropriate approvals and permits (collectively the "Approvals") which are necessary for the Proposed Use on the Property, and which otherwise satisfy Buyer's Contingencies related to Buyer's Proposed Use.  Such approvals may include, without limitation, platting or replatting, zoning approvals and/or rezoning of the Property, conditional use permits, access permits, signage permits, building permits, required licenses, site plan approvals and architectural approvals; subject, however, to the proviso contained in Section 10.6.

      5.1.1.3    On or before the Contingency Date (without regard to any extensions thereof), and without limitation of the terms of Section 5.1.1.2, Buyer shall be satisfied that it may develop the Property in accordance with a site plan, architectural plan, building plan, grading and drainage plan and other plans and specifications satisfactory to Buyer in its sole discretion.

      5.1.1.4    On or before the Contingency Date (without regard to any extensions thereof), Buyer shall have satisfied itself, in Buyer's sole discretion, that access to and from roads and the Property is adequate for the Proposed Use.

      5.1.1.5    On or before the Contingency Date (without regard to any extensions thereof), Buyer shall have satisfied itself, in

Buyer's sole discretion, that water and gas mains, electric power lines, sanitary and storm sewers and other utilities are available to the Property and are adequate for the Proposed Use.

5.1.1.6   Title shall have been found or made acceptable as provided in Section 8, and in accordance therewith, on or before the Closing Date, Buyer shall have received from Title an irrevocable commitment to issue a title insurance policy for the Property.

5.1.1.7   On or before the Closing Date, and without limitation of the terms of Section 5.1.1.6, Seller shall have obtained releases of the Property and any personal property located thereon from any and all mortgages or other liens, affecting any of the Property or any of said personal property.

5.1.1.8   On or before the Contingency Date (without regard to any extensions thereof), Buyer and Holiday Diversified Services, Inc. ("**Holiday**") shall have agreed upon the form and substance of a franchise agreement to be entered into by Buyer and Holiday with respect to operation of a franchised Holiday Stationstore on the Property, and on or before the Closing Date Buyer and Holiday shall have entered into such agreement.

5.1.1.9   On or before the Contingency Date (as it may be extended pursuant to Section 5.1.3), Buyer shall be satisfied, in Buyer's sole and absolute discretion, with the Plat (as defined in Section 10.7), any agreements (including development agreements) to be entered into with respect to the Property in connection with the Plat or the Approvals, and any fees or special assessments to be paid by Buyer or levied against the Property on account of the Approvals, the Plat or any agreements entered into in connection therewith.

5.1.1.10   On or before the Contingency Date (without regard to any extensions thereof), Buyer shall have received a commitment for financing which Buyer, in Buyer's sole and absolute discretion, deems acceptable for the purchase and development of the Property.

The foregoing contingencies are for Buyer's sole and exclusive benefit and one (1) or more may be waived in writing by Buyer in its sole discretion.  Seller shall reasonably cooperate, and cause Trek Real Estate and Development, Inc. to reasonably cooperate, with Buyer's efforts to satisfy such contingencies.  Unless otherwise expressly stated herein, Buyer shall bear all cost and expense of satisfying Buyer's contingencies.  Buyer and Seller shall diligently pursue the satisfaction of such contingencies.  If any of the foregoing contingencies have not been

satisfied on or before the applicable contingency date, then this Agreement may be terminated, at Buyer's option, by written notice from Buyer to Seller.  Such written notice must be given on or before the applicable contingency date, or, subject to the extension of the Contingency Date set forth in Section 5.1.3, Buyer's right to terminate this Agreement pursuant to this Section 5.1 shall be waived.  If Buyer terminates this Agreement pursuant to this Section 5.1, then any amount previously paid by Buyer to Seller, including the Earnest Money, shall immediately be refunded to Buyer.  Upon termination, neither party shall have any further rights or obligations against the other regarding this Agreement or the Property.

5.1.2    If Buyer elects not to exercise any of the contingencies set out herein, such election may not be construed as limiting any representations or obligations of Seller set out in this Agreement.  Further, Buyer shall not be deemed to have waived any of the foregoing contingencies on account of its execution of this Agreement.

5.1.3    As used in this Agreement, the "Contingency Date" shall mean the first (1st) business day occurring one hundred twenty (120) days after the Effective Date.  If Buyer determines that it will not obtain the Approvals described in Section 5.1.1.2 above on or before the Contingency Date, then Buyer shall have the right to extend the Contingency Date, solely for the purpose of obtaining the Approvals and satisfying the contingency set forth in Section 5.1.1.9, for up to three (3) additional periods of thirty (30) additional days each by giving Seller notice thereof prior to the Contingency Date or the then-current Extended Contingency Date, as applicable (the Contingency Date, if and as extended, being herein referred to as the "Extended Contingency Date").

5.2    **Seller's Contingencies**.  Seller's obligation to proceed to Closing shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions:

5.2.1    Buyer shall have performed and satisfied all agreements, covenants and conditions required pursuant to this Agreement to be performed and satisfied by Buyer on or prior to the Closing Date.

5.2.2    All representations and warranties of Buyer contained in this Agreement shall be accurate as of the Closing Date.

Seller may in its sole discretion waive any of the conditions precedent set out in this Section 5.2.

6.      **Closing**.  The closing of the purchase and sale contemplated by this Agreement (the "**Closing**") shall occur on the date fifteen (15) days after the Contingency Date, as it may have been extended pursuant to Section 5.1.3 (the "**Closing Date**").  Seller agrees to deliver legal and actual possession of the Property to Buyer on the Closing Date.  All of the documents and deliveries described in Sections 6.1 and 6.2 shall be executed and delivered by Seller and Buyer, as the case may be, into escrow with Title not later than 12:30 p.m. CT on the day prior to the Closing Date. Title shall distribute such documents and deliveries to Seller and Buyer, as the case may be, on the Closing Date.

6.1      **Seller's Closing Documents and Deliveries**.   On  the  Closing

Date, Seller shall execute and/or deliver, as applicable, to Buyer the following:

6.1.1      **Limited Warranty Deed**.  A limited warranty deed, with state deed tax paid, conveying title to the Property to Buyer, free and clear of all encumbrances, except the Permitted Encumbrances (as defined in Section 8.1) (the "**Deed**").

6.1.2      **FIRPTA Affidavit**.  An affidavit of Seller certifying that Seller is not a "foreign person", "foreign partnership", foreign trust", "foreign estate"  or "disregarded entity" as those terms are defined in Section 1445 of the Internal Revenue Code of 1986, as amended.

6.1.3      **Seller's Affidavit**.  A standard owner's affidavit (ALTA form) from Seller which may be reasonably required by Title to issue an owner's policy of title insurance with respect to the Property with the so-called "standard exceptions" deleted.

6.1.4      **Restrictive Covenant**.  The Restrictive Covenant in the form of Exhibit C attached hereto and hereby made a part hereof (the "Restrictive Covenant").

6.1.5      **Settlement Statement**.  A settlement statement with respect to this transaction.

6.1.6      **General Deliveries**.  All other documents reasonably determined by Title to be necessary to transfer the Property to Buyer and to evidence that Seller (a) has satisfied all indebtedness with respect thereto, (b) has obtained such termination statements or releases from such secured creditors as may be necessary to ensure that the Property and the personal property located thereon is subject to no liens or encumbrances, (c) has obtained all consents from third parties necessary to effect the terms of this Agreement, including, without limitation, the consents of all parties holding an interest in the Property, (d) has provided such other documents as are reasonably determined by Title to be

necessary to issue policies of title insurance to Buyer with respect to the Property with the so-called "standard exceptions" deleted, and (e) has duly authorized the transactions contemplated hereby.

6.2.    **Buyer Closing Documents and Deliveries**.  On the Closing Date, Buyer shall execute and/or deliver, as applicable, to Seller the following:

6.2.1    **Payment of Purchase Price**.  The Purchase Price, in accordance with the terms of Section 1.2.

6.2.2    **Restrictive Covenant**.  The Restrictive Covenant.

6.2.3    **Settlement Statement**.  A settlement statement with respect to this transaction.

6.2.4    **General Deliveries**.  All other documents reasonably determined by Title to be necessary to evidence that Buyer has duly authorized the transactions contemplated hereby and evidence the authority of Buyer to enter into and perform this Agreement and the documents and instruments required to be executed and delivered by Buyer pursuant to this Agreement, or may be required of Buyer under applicable law, including any purchaser's affidavits or revenue or tax certificates or statements.

7.    **Prorations**.  Seller and Buyer agree to the following prorations and allocation of costs regarding this Agreement:

7.1    **Title Evidence and Closing Fee**.   Seller will pay all costs of the Commitment with respect to the Property, and Buyer will pay the cost of the Survey and all premiums for any title insurance policy it desires with respect to the Property.  Buyer and Seller shall each pay one-half (1/2) of any closing fee or charge imposed by Title.

7.2    **Transfer Taxes; Sales Taxes.**  Seller shall pay all state deed tax regarding the Deed.  Seller shall pay all sales tax due, if any, regarding this transaction.

7.3    **Recording Costs**.  Seller will pay the cost of recording all documents necessary to place record title to the Property in Seller.  Buyer will pay all recording costs with respect to the recording of the Deed and the Restrictive Covenant.

7.4    **Real Estate Taxes and Special Assessments**.   General real estate taxes applicable to any of the Property due and payable in the year of Closing shall be prorated between Seller and Buyer on a daily basis as of 12:00 a.m. CT on the

Closing Date based upon a calendar fiscal year, with Seller paying those allocable to the period prior to the Closing Date and Buyer being responsible for those allocable to the Closing Date and subsequent thereto.   Seller shall pay in full all special assessments (and charges in the nature of or in lieu of such assessments) levied or constituting a lien with respect to any of the Property as of the Closing Date (except for any levied with respect to the development of the Property for the Proposed Use), and Buyer shall be responsible for special assessments levied on or before the Closing Date with respect to the development of the Property for the Proposed Use, and special assessments levied after the Closing Date.

7.5    **Utilities**.  All utility expenses, including water, fuel, gas, electricity, telephone, sewer, trash removal, heat and other services furnished to or provided for the Property shall be prorated between Seller and Buyer on a daily basis as of the Closing Date, with Seller paying those allocable to the period prior to the Closing Date and Buyer being responsible for those allocable to the Closing Date (except for any levied with respect to the development of the Property for the Proposed Use) and subsequent thereto.  The parties agree to have all meters with respect to any such utilities read as of the Closing Date.

7.6    **Operating Costs and Income**.  All other operating costs and income of the Property shall be prorated between Seller and Buyer as of 12:01 a.m. CT on the Closing Date, with Seller paying those allocable to the period prior to the Closing Date and Buyer being responsible for those allocable to the Closing Date and subsequent thereto.

7.7    **Attorneys' Fees**.    Seller and Buyer shall each pay its own attorneys' fees incurred in connection with this transaction.

8.    **Title Examination**. Within twenty (20) days after  the Effective Date,  Buyer shall obtain the following: (i) a commitment for an owner's title insurance policy (ALTA Form 2006) issued by Title for the Property, and copies of all encumbrances described in the commitment (the **"Commitment"**); and (ii) an ALTA-certified survey bearing the legal description of the Property, and showing the area, dimensions and location of the Property (the **"Survey"** and, together with the Commitment, the **"Title Evidence"**).

8.1    **Buyer's Objections**.  Within twenty (20) days after Buyer's receipt of the last of the Title Evidence, Buyer may make written objections (**"Objections"**) to the form or content of the Title Evidence.  The Objections may include without limitation, any easements, restrictions or other matters which may interfere with the Proposed Use of the Property or matters which may be revealed by the Survey.  Any matters reflected on the Title Evidence which are not objected to by Buyer within such time period shall be deemed to be permitted

{00135415 }                          9

encumbrances (**"Permitted Encumbrances"**). Buyer shall have the renewed right to object to the Title Evidence as the same may be revised or endorsed from time to time.

     8.2   **Seller's Cure**. Seller shall be allowed twenty (20) days after the making of Buyer's Objections to cure the same but shall have no obligation to do so. If such cure is not completed within said period, or if Seller elects not to cure such Objections, Buyer shall have the option to do any of the following:

     8.2.1   Terminate this Agreement with respect to all of the Property.

     8.2.2   Withhold from the Purchase Price an amount which, in the reasonable judgment of Title, is sufficient to discharge at Closing any mortgage, judgment or other monetary lien objected to by Buyer.

     8.2.3   Waive one or more of its objections and proceed to Closing.

If Buyer so terminates this Agreement for Seller's failure to cure Buyer's Objections, neither Seller nor Buyer shall be liable to the other for any further obligations nor have any further rights under this Agreement and any amount previously paid by Buyer to Seller, including the Earnest Money, shall be refunded to Buyer.

     9.   **Warranties and Representations**.

     9.1   **By Seller**.  Seller warrants and represents the following to Buyer, and acknowledges that Buyer has relied on such representations and warranties in agreeing to enter into this Agreement:

     9.1.1   This Agreement has been duly executed and delivered and constitutes the legal, valid and binding obligation of Seller enforceable in accordance with its terms. Seller has been duly formed under the laws of the State of Minnesota and is in good standing under the laws of the jurisdiction in which the Property is located, and has the requisite power and authority to enter into and perform this Agreement and the documents and instruments required to be executed and delivered by Seller pursuant hereto. This Agreement and the documents and instruments required to be executed and delivered by Seller pursuant hereto have each been duly authorized by all necessary action on the part of Seller and such execution, delivery and performance does and will not conflict with or result in a violation of Seller's Articles of Incorporation or Bylaws or any judgment or order.

9.1.2    The execution, delivery and performance by Seller of this Agreement will not (a) violate any provision of any law, statute, rule or regulation or any order, writ, judgment, injunction, decree, determination or award of any court, governmental agency or arbitrator presently in effect having applicability to Seller, or (b) result in a breach of or constitute a default under any indenture, loan or credit agreement or any other agreement, lease or instrument to which Seller is a party or by which it or any of its properties may be bound.

9.1.3    No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any governmental or public body or authority, or any other entity, is required on the part of Seller to authorize, or is required in connection with, the execution, delivery and performance of, or the legality, validity, binding effect or enforceability of, this Agreement.

9.1.4    There are no actions, suits or proceedings pending or threatened against or affecting Seller or any of its properties, before any court or arbitrator, or any governmental department, board, agency or other instrumentality which (a) challenges the legality, validity or enforceability of this Agreement, or (b) if determined adversely to Seller, would have a material adverse effect on the ability of Seller to perform its obligations under this Agreement, except for pending collection and foreclosure action by the Lender against Seller and other parties with respect to the Mortgage Encumbrances.

9.1.5    Seller has not received written notice, and has no knowledge, of (a) any pending or contemplated annexation or condemnation proceedings, or purchase in lieu of the same, affecting or which may affect all or any part of the Property, (b) any proposed or pending proceeding to change or redefine the zoning classification of all or any part of the Property, (c) any proposed changes in any road patterns or grades which would adversely and materially affect access to the roads providing a means of ingress or egress to or from all or any part of the Property, or (d) any uncured violation of any legal requirement, restriction, condition, covenant or agreement affecting all or any part of the Property or the use, operation, maintenance or management of all or any part of the Property.

9.1.6    There are no development agreements or other agreements or understandings with respect to public or private improvements regarding the Property, except for those listed on Exhibit B attached hereto.

9.1.7    There are no wells or sewage treatment systems located on any portion of the Property.  There has been no methamphetamine production on or about any portion of the Property.  The sewage generated by the Property, if any, goes to a facility permitted by the Minnesota Pollution Control Agency and there is no "individual sewage treatment system" (as defined in Minnesota Statutes § 115.55, Subd. 1(g)) located on the Property.

9.1.8    Seller is not a "foreign person", "foreign corporation", "foreign trust", "foreign estate" or "disregarded entity" as those terms are defined in Section 1445 of the Internal Revenue Code.

9.1.9    To Seller's actual knowledge, except as may be disclosed in the environmental reports listed on Exhibit B attached hereto, (i) no condition exists on the Property that may support a claim or cause of action under any Environmental Law, (ii) there are no Hazardous Substances on the Property, (iii) there has been no release, spill, leak or other contamination of Hazardous Substances onto the Property, and (iv) there are no restrictions, clean ups or remediation plans with respect to the Hazardous Substances specific to the Property.

9.1.10.   There are no leases or tenancies with respect to the Property.  There are no agreements or other contracts of any nature or type, including, without limitation, any supply, distributor or franchise agreements relating to, affecting or serving the Property except as disclosed to Buyer pursuant to Section 2 and there shall be none as of the Closing Date.

9.1.11    There will be no indebtedness attributable to the Property which will remain unpaid after the Closing Date.

The representations and warranties set forth in this Section 9.1 shall not be limited as a result of any investigations conducted by Buyer, whether with respect to environmental matters or otherwise.   The representation, warranties and other provisions of this Section 9.1 shall survive Closing for a period of one (1) year thereafter.

9.2    **By Buyer**.  Buyer warrants and represents the following to Seller, and acknowledges that Seller has relied on such representations and warranties in agreeing to enter into this Agreement:

9.2.1    Buyer is a Minnesota limited liability company, and has all requisite corporate power and authority to carry on its business as now conducted, to enter into this Agreement and to perform all of its obligations under this Agreement.

9.2.2    The execution, delivery and performance by Buyer of this Agreement has been duly authorized by all necessary company action. The representatives of Buyer executing this Agreement have full authority to bind Buyer to this Agreement. This Agreement has been duly executed and delivered and constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms.

9.2.3    The execution, delivery and performance by Buyer of this Agreement will not   (a) violate any provision of any law, statute, rule or regulation or any order, writ, judgment, injunction, decree, determination or award of any court, governmental agency or arbitrator presently in effect having applicability to Buyer, (b) violate or contravene any provision of the member control agreement or operating agreement of Buyer, or (c) result in a breach of or constitute a default under any indenture, loan or credit agreement or any other agreement, lease or instrument to which Buyer is a party or by which it or any of its properties may be bound.

The representations, warranties and other provisions of this Section 9.2 shall survive Closing.

10.    **Additional Obligations of Seller and Buyer**.

10.1    **Licenses and Permits**.    Seller shall transfer to Buyer all transferable rights, if any, in any permits or licenses held by Seller with respect to the Property, to the extent necessary to enable Buyer to develop and use the Property for the Proposed Use.  Seller shall execute all applicable transfer forms and applications to facilitate and effect any such transfer and to cooperate fully with Buyer in its efforts to obtain all of the necessary licenses and permits for the Proposed Use.

10.2    **Condition of Property at Closing**.  On the Closing Date, Seller shall deliver to Buyer exclusive vacant possession of the Property, free and clear of personal property, waste and debris of any kind.  On or before the Closing Date, Seller shall remove all trash, personal property and inventory from the Property.  Seller agrees that Buyer may dispose of any trash, personal property or inventory remaining on the Property as of the Closing Date in Buyer's sole discretion and Seller agrees to pay for all costs and expenses incurred by Buyer with respect to the transport and/or disposal of the personal property within ten (10) days after receipt of an invoice from Buyer.

10.3    **Further Assurances**.  From and after the Closing Date, Seller agrees to execute, acknowledge and deliver to Buyer such other documents or instruments of transfer or conveyance as may be reasonably required to carry out its obligations pursuant to this Agreement.

{00135415 }                                    13

10.4 **Non-Assumption of Contracts or Other Obligations**. The parties understand and agree that Buyer is only acquiring certain of Seller's real property assets and that this Agreement and any related agreements shall not be construed to be in any manner whatsoever an assumption by Buyer of any agreements, indebtedness, obligations or liabilities of Seller which are owing with respect to the operation of the Property prior to the Closing Date, including, without limitation, any obligations with respect to (a) payroll, payroll tax, any other form of withholding tax, union obligations or employee benefits, (b) except as otherwise provided in Section 7.4, sales and use tax, income tax, real or personal property tax or other obligations owing to the State of Minnesota or to any other city, county, state or federal authority, (c) any vendor payables, and (d) any other obligations of Seller's business which are owing with respect to the operation of the Property prior to the Closing Date. Seller agrees to pay all such obligations in the ordinary course of business.

10.5 **Mortgage Encumbrances**.  Seller and Buyer acknowledge that the Property is encumbered by the following (collectively, the "**Mortgage Encumbrances**"):

(a) that certain Mortgage and Security Agreement and Fixture Financing Statement currently in favor of BMO Harris Bank, f/k/a M&I Marshall and Ilsley Bank ("**Lender**") dated March 21, 2000, recorded March 28, 2000 as Document No. 7279083, as assumed per Loan Assumption Agreement dated April 30, 2001 recorded June 25, 2001 as Document No. 7494367, and as amended by Amendment to Mortgage and Assignment of Rents and Leases dated March 21, 2005, recorded July 1, 2005 as Document No. 8608954, by Amended and Restated Mortgage and Security Agreement and Fixture Financing Statement dated December 8, 2006, recorded January 24, 2007 as Document No. 8926398, by Second Amended and Restated Mortgage and Security Agreement and Fixture Financing Statement dated June 25, 2007, recorded July 23, 2007 as Document No. 9011238, by Loan Modification Agreement dated July 21, 2009, recorded October 21, 2009 as Document No. 9433935, by Loan Modification Agreement dated April 1, 2010, recorded April 8, 2010 as Document No. 9499485, and by Loan Modification Agreement dated June 1, 2010, recorded June 10, 2010 as Document No. 9522978, and a Notice of Lis Pendens regarding foreclosure of which was dated October 26, 2010, recorded October 27, 2010 as Document No. 9576578.

(b) that certain Assignment of Rents and Leases currently in favor of Lender dated March 21, 2000, recorded March 28, 2000 as Document No. 7279084, as assumed per Loan Assumption Agreement dated April 30, 2001 recorded June 25, 2001 as Document No. 7494367, and as amended by Amendment to Mortgage and Assignment of Rents and Leases dated March 21, 2005, recorded July 1, 2005 as Document No. 8608954, by Amended and Restated Assignment of Rents and Leases dated December 8, 2006, recorded January 24, 2007 as

Document No. 8926399, by Second Amended and Restated Assignment of Rents and Leases dated June 25, 2007, recorded July 23, 2007 as Document No. 9011239, by Loan Modification Agreement dated July 21, 2009, recorded October 21, 2009 as Document No. 9433935, by Loan Modification Agreement dated April 1, 2010, recorded April 8, 2010 as Document No. 9499485, and by Loan Modification Agreement dated June 1, 2010, recorded June 10, 2010 as Document No. 9522978.

(c)  that certain Mortgage and Security Agreement and Fixture Financing Statement currently in favor of Lender dated March 21, 2000, recorded April 25, 2000 as Document No. 7290704, as amended by Amendment to Mortgage and Assignment of Rents and Leases dated March 21, 2005, recorded July 1, 2005 as Document No. 8608953, by Amended and Restated Mortgage and Security Agreement and Fixture Financing Statement dated December 8, 2006, recorded January 24, 2007 as Document No. 8926398, by Second Amended and Restated Mortgage and Security Agreement and Fixture Financing Statement dated June 25, 2007, recorded July 23, 2007 as Document No. 9011238, by Loan Modification Agreement dated July 21, 2009, recorded October 21, 2009 as Document No. 9433935, by Loan Modification Agreement dated April 1, 2010, recorded April 8, 2010 as Document No. 9499485, and by Loan Modification Agreement dated June 1, 2010, recorded June 10, 2010 as Document No. 9522978, and a Notice of Lis Pendens regarding foreclosure of which was dated October 26, 2010, recorded October 27, 2010 as Document No. 9576578.

(d) that certain Assignment of Rents and Leases currently in favor of Lender dated March 21, 2000, recorded March 28, 2000 as Document No. 7290705, as amended by Amendment to Mortgage and Assignment of Rents and Leases dated March 21, 2005, recorded July 1, 2005 as Document No. 8608953, by Amended and Restated Assignment of Rents and Leases dated December 8, 2006, recorded January 24, 2007 as Document No. 8926399, by Second Amended and Restated Assignment of Rents and Leases dated June 25, 2007, recorded July 23, 2007 as Document No. 9011239, by Loan Modification Agreement dated July 21, 2009, recorded October 21, 2009 as Document No. 9433935, by Loan Modification Agreement dated April 1, 2010, recorded April 8, 2010 as Document No. 9499485, and by Loan Modification Agreement dated June 1, 2010, recorded June 10, 2010 as Document No. 9522978.

As of the Effective Date, Seller has provided assurances to Buyer, either in the form of a written consent by Lender to the transaction contemplated hereby, or otherwise, that the Property shall be released from the Mortgage Encumbrances at or prior to Closing, and Seller hereby covenants and agrees that it shall use commercially reasonable efforts and all due diligence to ensure that the Mortgage Encumbrances are so released at or prior to Closing. Notwithstanding anything in this Agreement to the contrary, Buyer shall not be obligated to close on the transaction contemplated by this Agreement, and shall be entitled to terminate this Agreement upon written notice to Seller and receive

a return of the Earnest Money in the event the Mortgage Encumbrances, or any other monetary liens encumbering the Property, are not satisfied or released from the Property at or prior to Closing.

10.6 **Governmental Approvals**. Buyer shall, within sixty (60) days following the Effective Date, make application for the Approvals. Seller will reasonably cooperate, and cause TREK Real Estate and Development, Inc. to reasonably cooperate, with Buyer's efforts to obtain the Approvals at or prior to the Contingency Date, and to the extent the same requires coordination with Seller's Plat obligations set forth in Section 10.7 below, Buyer and Seller shall act reasonably to coordinate obtaining such Approvals and Plat. Seller hereby grants Buyer the right to file and prosecute applications and petitions for the Approvals; provided, however, any special use permits, rezoning or variances shall (a) be contingent on the occurrence of the Closing and shall not be binding upon Seller or the Property unless and until the Closing occurs, or (b) be approved in writing in advance by Seller.

10.7 **Platting**. Seller shall, within sixty (60) days after the Effective Date, make application for and thereafter cause the Property to be platted at or before Closing providing for the accomplishment of the Approvals and related Buyer's Contingencies. Any costs and expenses in connection with such platting (but excluding Seller's attorneys' fees) shall be paid by Buyer. Seller shall reasonably confer with Buyer regarding the forms of the preliminary plat and final plat, including the configuration of the Property and any easements or other rights granted therein, and any development agreement or other agreement to be entered into and affecting the Property, in each case prior to execution and/or final approval thereof. Seller shall make such reasonable changes to any of the foregoing documents as Buyer shall request from time to time. The final plat of the Property is referred to as the "Plat".

10.8 **Seller Bankruptcy.**

10.8.1 **Approval**. Buyer acknowledges that Seller may become a debtor in a proceeding under Chapter 11 of the United States Bankruptcy Code. In such event, Buyer shall not be obligated to close on the transaction contemplated by this Agreement, and shall be entitled to terminate this Agreement upon written notice to Seller and receive a return of the Earnest Money in the event this Agreement is not promptly assumed and the sale transaction approved by the bankruptcy court, Seller agreeing to use commercially reasonable efforts and all due diligence to promptly obtain such approval within sixty (60) days following any Chapter 11 filing. Any bankruptcy court order approving the sale transaction contemplated by this Agreement shall be in form and substance acceptable to Buyer, and shall contain findings of fact and conclusions of law establishing that Buyer is a good faith purchaser entitled to the protections of 11 U.S.C. §363(m) and shall have, at Closing, good title to

the Property free and clear of the Mortgage Encumbrances and all other liens and encumbrances, other than Permitted Encumbrances.

10.8.2      **Bidding; Fees**.  Buyer acknowledges that the sale transaction under this Agreement may be subject to higher and better offers prior to obtaining the bankruptcy court approval described in Section 10.8.1.  Seller shall, within thirty (30) days following any bankruptcy filing by Seller, file a motion with the bankruptcy court requesting entry of an order in form and substance acceptable to Buyer, which will (a) fix a hearing date to approve this Agreement, (b) establish bidding procedures for alternative bids and an initial overbid amount, (c) establish that if the Property is sold to a successful bidder other than the Buyer, and Buyer is not in breach of this Agreement, then in addition to a full return of Buyer's Earnest Money, Buyer shall receive a cash break-up fee of Fifty Thousand and No/100 Dollars ($50,000) (the "**Break-Up Fee**") in consideration of the expenses and risks that Buyer incurred in connection with this Agreement and its due diligence hereunder, including seeking the Approvals, (d) provide that Seller is obligated to pay the Break-Up Fee to Buyer out of Seller's bankruptcy estate and that the same shall constitute an allowed administrative expense claim arising under Bankruptcy Code §§ 503(b), 506(c) and 507(a)(1), payable solely from the proceeds of the sale of the Property, and that the Break-Up fee shall be paid to Buyer directly at the closing on the sale of the Property, and (e) provide that the Earnest Money shall not be the property of the Seller's bankruptcy estate and that no party shall have a lien on the Earnest Money.

11.      **Environmental Matters.**  [Intentionally Deleted]

12.      **General Indemnification**.  [Intentionally Deleted]

13.      **Commissions**.  Each party represents that all negotiations on its behalf relative to this Agreement and the transactions contemplated by this Agreement have been carried on directly between the parties, without the intervention of any party as broker, finder or otherwise and that there are no claims for brokerage commissions or finders' fees in connection with the execution of this Agreement, except that Seller has engaged Trek Real Estate and Development, Inc. in connection with this Agreement and is obligated to pay TREK Real Estate and Development, Inc. a brokerage commission.  Each party hereby indemnifies the other from and against all losses, damages, costs, expenses (including reasonable fees and expenses of attorneys), causes of action, suits or judgments of any nature arising out of any claim, demand or liability to or asserted by any broker, agent or finder, other than TREK Real Estate and Development, Inc., claiming to have acted on behalf of the indemnifying party in connection with this transaction.

14.      **1031 Tax Deferred Exchange**.  Seller agrees that Buyer may engage in a deferred exchange of like-kind property utilizing a qualified intermediary or other mechanism pursuant to Section 1031 of the Internal Revenue Code.  Notwithstanding any provision herein to the contrary, in the event Buyer elects to engage in a deferred

like-kind exchange, Seller agrees to consent to the assignment of Buyer's rights under this Agreement to a qualified intermediary in order to facilitate the deferred like-kind exchange.   The parties agree to execute any and all documents necessary to consummate the purposes of this Section 14.

15.   **Notice**.   Any notice to be given by one party hereto to the other shall be personally delivered (including messenger delivery), or be sent by registered or certified mail, postage prepaid, or by a nationally recognized overnight courier which issues a receipt to the other party at the addresses in this Section 15 (or to such other address as may be designated by notice given pursuant to this Section 15), and shall be deemed given, as the case may be, upon personal delivery, three (3) days after the date postmarked, or one (1) business day after delivery to such overnight courier.

If to Buyer:

Gregory Geller
Geller Industries, LLC
1940 Hadley Creek Drive, NE
Rochester, MN  55906

with a copy to:

Timothy R. Geck
Geck, Duea & Olson, PLLC
4770 White Bear Parkway, Suite 100
White Bear Lake, MN 55110

If to Seller:

Hustad Investment Corporation
10470 White Tail Crossing
Eden Prairie, MN  55347
Attention: Elisabeth Hustad

with a copy to:

Jay F. Cook
Law Offices of Jay F. Cook, P.L.
5150 North Tamiami Trail, Suite 201
Naples, FL 34103

16.   **Default; Remedies**.   If either Seller or Buyer fails to perform any of its obligations under this Agreement in accordance with its terms, and such failing party does not cure such failure within thirty (30) days after written notice thereof from the other party (provided that no notice or cure period shall be required for obligations to be performed at Closing), then the other party shall have the right to terminate this

Agreement by giving the failing party written notice of such election.  In the case of any default by Buyer, Seller's sole and exclusive remedy shall be termination of this Agreement as provided above and, upon any such termination, the Earnest Money shall be forfeited to Seller as agreed and final liquidated damages.  In the case of any default by Seller, upon termination of this Agreement, the Earnest Money shall be returned to Buyer.   In addition to such right of termination, Buyer, as its sole and exclusive remedies, shall also have the right to specifically enforce this Agreement or recover from Seller the amount of out-of-pocket costs and expenses incurred by Buyer in connection with this Agreement, not to exceed Twenty-five Thousand and No/100 Dollars ($25,000.00).  In any action or proceeding to enforce this Agreement or any term hereof, the prevailing party shall be entitled to recover its reasonable costs and attorneys' fees.

17. **Cumulative Rights**.  No right or remedy conferred or reserved to Seller or Buyer is intended to be exclusive of any other right or remedy herein or by law provided, but each shall be cumulative and in addition to every other right or remedy existing at law, in equity or by statute, now or hereafter.

18. **Entire Agreement; Modification**.  This written Agreement constitutes the complete agreement between the parties with respect to this transaction and supersedes any prior oral or written agreements between the parties regarding this transaction.  There are no verbal agreements that change this Agreement and no waiver of any of its terms will be effective unless in a writing executed by the parties.

19. **Binding Effect; Survival**.  This Agreement binds and benefits the parties and their respective successors and assigns.  Buyer may not assign this Agreement without the prior written consent of the Seller.  All representations and warranties and obligations of the parties hereto shall not survive the Closing, except as otherwise expressly provided herein.

20. **Governing Law**.  The provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

21. **Counterparts; Facsimiles**.  This Agreement may be executed in any number of counterparts, and all of the signatures to this Agreement taken together shall constitute one and the same agreement, and either of the parties hereto may execute such agreement by signing any such counterpart.  Facsimile or "PDF" signatures on this Agreement shall be treated as originals until the actual original signatures are obtained.

22. **Represented by Counsel**.  Each party has been represented and advised by counsel in the transaction contemplated hereby.

23. **Time of the Essence**.  Time is of the essence of this Agreement.

**IN AGREEMENT**, the parties hereto have caused this Agreement to be duly executed as of the date hereinbefore first written.

BUYER:                                          SELLER:

GELLER INDUSTRIES, LLC                          HUSTAD INVESTMENT
CORPORATION

BY_____            BY_____
       Gregory Geller                                  Elisabeth Hustad
       Its Chief Manager                               Its President

## ACKNOWLEDGMENT BY TITLE COMPANY

First American Title Insurance Company (**"Title Company"**) hereby acknowledges receipt of the initial Earnest Money in the amount of Ten Thousand and No/100 Dollars ($10,000.00) pursuant to the attached Purchase Agreement (the **"Purchase Agreement"**), and agrees to act as escrow agent and hold and disburse the Earnest Money in accordance with the terms of this Acknowledgement and the attached Purchase Agreement. The initial Earnest Money, together with any additional Earnest Money which may be deposited by Buyer under the Purchase Agreement, is referred to herein as the **"Deposit"**.

Seller and Buyer, through execution of the Purchase Agreement to which this Acknowledgement is attached, and Title Company, through execution of this Acknowledgement, acknowledge and agree that the Deposit shall and remains the property of Buyer, to be held in trust by Title Company in accordance with the Purchase Agreement, and that until such funds are required to be released to Seller as provided in the Purchase Agreement, the funds shall not be considered property of Seller. The Deposit shall be held in an FDIC insured, interest-bearing account with interest accruing to the benefit of Buyer, unless Seller receives the Deposit pursuant to the Purchase Agreement, in which event the interest shall also be disbursed to the Seller.

The sole duties of Title Company shall be those described herein, and Title Company shall be under no obligation to determine whether the other parties hereto are complying with any requirements of law or the terms and conditions of any other agreements among said parties. Title Company may conclusively rely upon and shall be protected in acting upon any notice, consent, order or other document believed by it to be genuine and to have been signed or presented by the proper party or parties, consistent with reasonable due diligence on Title Company's part. Title Company may consult the advice of counsel with respect to any issue concerning the interpretation of its duties hereunder. Buyer and Seller hereby acknowledge such fact and indemnify and hold harmless Title Company from any action taken by it in good faith in reliance thereon. Title Company shall have no duty or liability to verify any such notice, consent, order or other document, and its sole responsibility shall be to act as expressly set forth in the Purchase Agreement. Title Company shall be under no obligation to institute or defend any action, suit or proceeding in connection with this Acknowledgement. If any dispute arises with respect to the disbursement of any monies, Title Company may continue to hold the same or commence an action in interpleader and in connection therewith remit the same to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Title Company for any action taken by it in good faith in the execution of its duties hereunder.

Title Company has executed this Acknowledgement as of the date provided below.

TITLE COMPANY:

First American Title Insurance Company

By: _____
Name: _____
Title: _____
Date: _____

**EXHIBIT A**
**TO PURCHASE AGREEMENT**


**LEGAL DESCRIPTION OF THE PROPERTY**
Eden Prairie, Minnesota


That part of Lot 1, Block 2, Bluff Country Village 2nd Addition, and adjoining Outlot A to Bluff Country Village 2nd Addition, Hennepin County, Minnesota, shown on the attached proposed station store site plan, consisting of approximately 1.534 acres, more or less.

(Drawing)



PROPOSED
SITE PLAN
Option 1

STATIONSTORE #XXXX
Eden Prairie, MN

SAMPLE

**EXHIBIT B**
**TO PURCHASE AGREEMENT**

**DUE DILIGENCE MATERIALS**

1. Report of Subsurface Exploration and Geotechnical Review prepared by American Engineering Testing, Inc. for Trek Development, Inc., dated November 15, 2002.

2. Phase I Environmental Site Assessment prepared by Peer Engineering, Inc. for Pioneer Trail Partners and M&I Marshall & Ilsley Bank, dated April 4, 2006.

{00135415 }

**EXHIBIT C**
**TO PURCHASE AGREEMENT**

RESTRICTIVE COVENANT

## RESTRICTIVE COVENANT

**THIS RESTRICTIVE COVENANT** (this **"Agreement")** is entered into as of _____, 20___ (the **"Effective Date"**), by and between **HOLIDAY STATIONSTORES, INC.**, a Minnesota corporation, 4567 American Boulevard West, Minneapolis, Minnesota 55437 (**"Holiday"**), and **GELLER INDUSTRIES, LLC**, a Minnesota limited liability company, 1940 Hadley Creek Drive, NE, Rochester, Minnesota 55906 ("**Geller**"), and **HUSTAD INVESTMENT COPORATION**, a Minnesota corporation, 10470 White Tail Crossing, Eden Prairie, Minnesota 55347 (**"Owner"**).

### RECITALS

A.      Pursuant to that certain Purchase Agreement between Geller and Owner dated as of _____, 20___, Geller has purchased certain property from Owner, which property is legally described on Exhibit A (the **"Holiday Property"**), and on which property Geller plans to construct and operate a 24-hour "Holiday Stationstore".

B.      Owner owns certain other properties located in Eden Prairie, Minnesota, which are described on Exhibit B (collectively, the **"Owner Property"**).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner, Holiday and Geller agree as follows:

1.      **Restrictive Covenants**.  Owner hereby covenants and agrees with Holiday and Geller that, for the longest period allowed by law, the Owner Property shall not be used in any manner whatsoever for the uses described on Exhibit C.  Notwithstanding the foregoing, if use of the Holiday Property as a Holiday Stationstore, or as a gas station and convenience store under another brand, is abandoned, or ceases or is discontinued for a continuous period of two (2) years, this Agreement shall be null and void and of no further force and effect.

2.      **Remedies**.  If Owner should breach this Agreement, Holiday and Geller would suffer irreparable harm for which a recovery of money damages would be an inadequate remedy.  It is therefore agreed that Holiday and Geller shall be entitled, as a matter of right, in any court of competent jurisdiction, to a mandatory injunction restraining and enjoining Owner, pending litigation, as well as upon final determination

thereof, from attempting to violate or violating this Agreement.  It is further agreed that Holiday's and Geller's right to such injunctive relief shall be cumulative with and in addition to any other rights, remedies or actions which Holiday and Geller may have against Owner.

3.    **Successors**.  This Agreement shall not be terminated by (a) the voluntary dissolution of Owner or Holiday or Geller or any parent, subsidiary or successor of Owner or Holiday or Geller; (b) merger whereby Owner or Holiday or Geller (or such parent, subsidiary or successor of Owner or Holiday or Geller) is not the surviving or resulting corporation; or (c) any transfer of substantially all of the assets of Owner or Holiday or Geller.  In the event of any such merger or consolidation or transfer of assets, the provisions of this Agreement shall inure to the benefit of and shall be binding upon the surviving or resulting corporation or other entity or the corporation or other entity to which such assets shall be transferred.

4.    **Assignment**.  The rights of Holiday under this Agreement may, without the consent of the undersigned, be assigned by Holiday to any parent, subsidiary, affiliate or successor of Holiday.

5.    **Running of Benefits and Burdens**.  All provisions of this Agreement, including the benefits and burdens, run with the land and are binding upon and shall inure to the benefit of the assigns and successors of the parties to this Agreement such that the provisions of this Agreement shall restrict Owner and the Owner Property, and inure to the benefit of Holiday and Geller and the Holiday Property, notwithstanding any sale or transfer of the Owner Property and/or the Holiday Property to a third party.

6.    **Notice**.  Any notice to be given by one party hereto shall be personally delivered, sent by registered or certified mail or sent by a nationally recognized courier service that issues a receipt to the other party hereto at the addresses set forth for each party in the first paragraph of this Agreement, in each case to the attention of the President if the party receiving notice is a business entity, and with a copy in Holiday's case to its Legal Department, and shall be deemed given upon the earlier of personal delivery, the date postmarked, delivery to such courier or the refusal to accept such service.  Each party shall have the right from time to time to change its address for notices by notice given to the other parties.

7.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

8.    **Cumulative Rights**.  Each and all of the various rights, powers and remedies of Holiday and Geller in this Agreement shall be considered as cumulative with and in addition to any other rights, powers or remedies of Holiday and Geller, and no one of them is exclusive of the others or is exclusive of any other rights, powers and remedies allowed by law.  The exercise or partial exercise of any right, power or remedy shall neither constitute the election thereof nor the waiver of any other power or remedy.

9.    **Amendment**.  This Agreement may be modified or amended only by written instrument executed by Owner, Holiday and Geller.

**IN WITNESS WHEREOF**, Holiday, Geller and Owner have executed this Agreement as of the date first above written.


HOLIDAY STATIONSTORES, INC.          HUSTAD INVESTMENT CORPORATION


By _____             By_____
Name: Lynn M. Anderson                Name:  Elisabeth R. Hustad
Its:  Assistant Secretary             Its:  President


GELLER INDUSTRIES, LLC


By _____
Name: Gregory Geller
Its:  Manager


STATE OF MINNESOTA   )
                     ) ss.
COUNTY OF HENNEPIN   )

    On this ___ day of _____, 20__, before me, a notary public in and for said State, personally appeared Lynn M. Anderson, the Assistant Secretary of Holiday Stationstores, Inc., a Minnesota corporation, and acknowledged to me that she executed the same on behalf of the corporation.


                              _____
                                   Notary Public

STATE OF MINNESOTA   )
                     ) ss.
COUNTY OF_____  )

    On this ___ day of _____, 20__, before me, a notary public in and for said State, personally appeared Gregory Geller, the Manager of Geller Industries, LLC, a Minnesota limited liability company, and acknowledged to me that he executed the same on behalf of the limited liability company.


                              _____
                                   Notary Public

STATE OF MINNESOTA  )
                             ) ss.

COUNTY HENNEPIN     )

On this ___ day of _____, 20__, before me, a notary public in and for said State, personally appeared Elisabeth R. Hustad, the President of Hustad Investment Corporation, a Minnesota corporation, and acknowledged to me that she executed the same on behalf of the corporation.

_____

Notary Public

THIS INSTRUMENT DRAFTED BY:

FAEGRE & BENSON LLP (_____)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901

EXHIBIT A
TO RESTRICTIVE COVENANT

## <u>LEGAL DESCRIPTION OF HOLIDAY PROPERTY</u>
(City, State)

[Property conveyed to Geller Industries, LLC]

EXHIBIT B
TO RESTRICTIVE COVENANT

## <u>LEGAL DESCRIPTION OF OWNER PROPERTY</u>
(City, State)

[Other property in Bluff Country Village owned by Hustad Investment Corporation.]

EXHIBIT C
TO RESTRICTIVE COVENANT

## **RESTRICTED USES**
(City, State)

Except for monitoring wells and borings not used to extract water (such as exploratory borings and environmental bore holes), no well shall be drilled, cored, bored, washed, driven, dug, jetted or otherwise constructed on the Owner Property for the purposes of location, diversion, artificial recharge or acquisition of groundwater.

No retail sales of gasoline, diesel or other motor fuel shall be made from the Owner Property.

No Cigarette Store shall be located on the Owner Property.

No Convenience Store or superette, whether or not such convenience store or superette sells gasoline, diesel or other motor fuel, shall be permitted on the Owner Property.

*No establishment selling or exhibiting "obscene" material shall be permitted on the Owner Property.*

No car wash shall be located on the Owner Property.

No signs advertising gasoline (other than a Holiday sign) shall be located on the Owner Property.

**"Cigarette Store"** means a facility primarily selling cigarettes and/or other tobacco products, at retail cost.  **"Convenience Store"** means a facility selling primarily: (a) groceries, and/or (b) sundries, and which operates in a building of less than fifteen thousand (15,000) square feet.

November 26, 2012

## AMENDMENT TO
## LETTER OF INTENT

Hustad Investment Corporation
10470 White Tail Crossing
Eden Prairie, MN 55347
Attention: Elisabeth R. Hustad

RE:    Letter of Intent dated October 25, 2012 regarding property located at the
intersection of Pioneer Trail and Highway 169, Eden Prairie, Minnesota
(the "Letter of Intent").

Dear Beth:

Reference is hereby made to the Letter of Intent, a copy of which is attached hereto. By
this letter we hereby agree that the 45-day period and 75-day period specified therein
shall be changed to 75 days and 105 days, respectively.   Please indicate your
agreement to the foregoing by signing this letter in the space provided below.

This letter may be delivered by facsimile or electronic mail and the parties agree to
accept and be bound by facsimile signatures or signatures sent by electronic mail.

Sincerely,

**GELLER INDUSTRIES, LLC**

By: _Geller Industries, LLC_
Name: _Geller_
Its: _____

AGREED THIS _26_ DAY OF NOVEMBER, 2012.

**HUSTAD INVESTMENT CORPORATION**

By: _____
Name: _Elisabeth R. Hustad_
Its:  President

January 10, 2013

## SECOND AMENDMENT TO
## LETTER OF INTENT

Hustad Investment Corporation
10470 White Tail Crossing
Eden Prairie, MN 55347
Attention: Elisabeth R. Hustad

RE:   Letter of Intent dated October 25, 2012 regarding property located at the intersection of Pioneer Trail and Highway 169, Eden Prairie, Minnesota, as amended by Amendment to Letter of Intent dated November 26, 2012 (as so amended, the "Letter of Intent").

Dear Beth:

Reference is hereby made to the Letter of Intent. By this letter we hereby agree that the 75-day period and 105-day period specified therein shall be extended to and including, and shall expire on, February 28, 2013 and April 1, 2013, respectively. We also agree that we will promptly begin, and thereafter during the extended time periods set forth above will continue, to work with you and your representatives and Holiday, and by signing this letter in the space provided below you agree that you and your representatives will work with us and Holiday, to contact and arrange meetings with the City of Eden Prairie and adjoining property owners to commence and facilitate the approval process with the City of Eden Prairie.

Please indicate your agreement to the foregoing by signing this letter in the space provided below. This letter may be delivered by facsimile or electronic mail and the parties agree to accept and be bound by facsimile signatures or signatures sent by electronic mail.

Sincerely,

**GELLER INDUSTRIES, LLC**

By: _Geller Industries LLC_
Name: _Jay Geller_
Its: _____

AGREED THIS 10TH DAY OF JANUARY, 2013.

**HUSTAD INVESTMENT CORPORATION**

By: _____
Name: _____ Elisabeth R. Hustad

## THIRD AMENDMENT TO
## LETTER OF INTENT

Hustad Investment Corporation
10470 White Tail Crossing
Eden Prairie, MN 55347
Attention: Elisabeth R. Hustad

RE: Letter of Intent dated October 25, 2012 regarding property located at the
intersection of Pioneer Trail and Highway 169, Eden Prairie, Minnesota,
as amended by Amendment to Letter of Intent dated November 26, 2012,
and by Second Amendment to Letter of Intent dated January 10, 2013
(as so amended, the "**Letter of Intent**").

Dear Beth:

Reference is hereby made to the Letter of Intent. By this letter we hereby agree that the
periods specified therein that expire on February 28, 2013 and April 1, 2013,
respectively, shall be extended to and including, and shall expire on, April 15, 2013 and
May 15, 2013, respectively. We also agree that we will promptly begin, and thereafter
during the extended time periods set forth above will continue, to work with you and
your representatives and Holiday, and by signing this letter in the space provided below
you agree that you and your representatives will work with us and Holiday, to contact
and arrange meetings with the City of Eden Prairie and adjoining property owners to
commence and facilitate the approval process with the City of Eden Prairie.

Please indicate your agreement to the foregoing by signing this letter in the space
provided below. This letter may be delivered by facsimile or electronic mail and the
parties agree to accept and be bound by facsimile signatures or signatures sent by
electronic mail.

Sincerely,

**GELLER INDUSTRIES, LLC**

By: _Geller Industries LLC_
Name: _Herb Geller_
Its:_____

AGREED THIS 8TH DAY OF MARCH, 2013.

**HUSTAD INVESTMENT CORPORATION**

By:_____
Name: Elisabeth R. Hustad
Its: President

March 8, 2013

## THIRD AMENDMENT TO
## LETTER OF INTENT

Hustad Investment Corporation
10470 White Tail Crossing
Eden Prairie, MN 55347
Attention: Elisabeth R. Hustad

RE:   Letter of Intent dated October 25, 2012 regarding property located at the
intersection of Pioneer Trail and Highway 169, Eden Prairie, Minnesota,
as amended by Amendment to Letter of Intent dated November 26, 2012,
and by Second Amendment to Letter of Intent dated January 10, 2013
(as so amended, the "**Letter of Intent**").

Dear Beth:

Reference is hereby made to the Letter of Intent.  By this letter we hereby agree that the
periods specified therein that expire on February 28, 2013 and April 1, 2013,
respectively, shall be extended to and including, and shall expire on, April 15, 2013 and
May 15, 2013, respectively.  We also agree that we will promptly begin, and thereafter
during the extended time periods set forth above will continue, to work with you and
your representatives and Holiday, and by signing this letter in the space provided below
you agree that you and your representatives will work with us and Holiday, to contact
and arrange meetings with the City of Eden Prairie and adjoining property owners to
commence and facilitate the approval process with the City of Eden Prairie.

Please indicate your agreement to the foregoing by signing this letter in the space
provided below.  This letter may be delivered by facsimile or electronic mail and the
parties agree to accept and be bound by facsimile signatures or signatures sent by
electronic mail.

Sincerely,

**GELLER INDUSTRIES, LLC**

By:_____
Name:_____
Its:_____

AGREED THIS 8TH DAY OF MARCH, 2013.

HUSTAD INVESTMENT CORPORATION

By:_____
Name:  Elisabeth R. Hustad
Its:  President

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | **Substantively Consolidated Under BKY 13-40789** |
| | |
| HUSTAD INVESTMENT CORPORATION, | BKY 13-40789 |
| HUSTAD REAL ESTATE COMPANY, | BKY 13-40786 |
| HUSTAD INVESTMENTS, LP, | BKY 13-40788 |
| | |
| Debtors. | Chapter 11 Cases |

---

## MEMORANDUM OF LAW

---

The Debtor submits this Memorandum in support of its Motion to Approve the Sale of Real Property Free and Clear of Interests. The facts pertaining to this Memorandum are set forth in Debtor's verified Motion.

## Applicable Legal Authority for Proposed Sale

Section 363 of the Bankruptcy Code provides that the Debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. §363(b). To approve the use, sale or lease of property outside the ordinary course of business, this court need only determine that the Debtor's decision is supported by "some articulated business justification." *See, e.g., Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also, Stephens Ind., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Abbott Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del. 1991).

{00135668   }

Once the Debtor articulates a valid business justification "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johnson-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attached to a Debtor's management decisions.").

Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (in re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Accordingly, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefor. *See Schipper*, 933 F.2d at 515; *In re Lionel Corp.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169 at 179.

As explained in the Motion, Debtor has a sound business justification for selling the Real Property at this time. The sale is in the interests of creditors and equity security holders.

Under § 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     Such entity consents;

(3)     such interests is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)     such interests is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

-2-

Because section 363(f) is drafted in the disjunctive, the Debtor's satisfaction of any one of its five requirements will be sufficient to permit the sale of the Assets free and clear of liens, claims and other interests (collectively the "Interests"). BMO holds a mortgage on the Real Property. The Debtor is reasonably confident that it will obtain BMO's consent to the sale and will thereby satisfy the requirements of §363(f)(2).[1]

Moreover, all holders of Interests can be compelled to accept a money satisfaction of such Interests in legal or equitable proceedings in accordance with §363(f)(5). Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to 11 U.S.C. §1129(b)(2)(A).

Indeed, §1129(b)(2)(A) specifically allows a debtor in possession to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any claims and defenses the Debtor may possess with respect thereto. The Debtor proposes that any Interests in the Real Property attach to the proceeds of sale.

**WHEREFORE**, Debtor requests that the Court enter the relief requested in the Motion.

Dated: April 11, 2013

RAVICH MEYER KIRKMAN
McGRATH NAUMAN & TANSEY,
A PROFESSIONAL ASSOCIATION

By   /e/  Michael L. Meyer (72527)
        Will R. Tansey (323056)

4545 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

ATTORNEYS FOR DEBTOR

---

1 To the extent that any other entity asserts a lien on the Assets, the Debtor requests approval of this Motion under 11 U.S.C. §363(f)(1) and (f)(3).

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

In re:                                                    **Substantively Consolidated Under**
                                                          **BKY 13-40789**

HUSTAD INVESTMENT CORPORATION,                            BKY 13-40789
HUSTAD REAL ESTATE COMPANY,                               BKY 13-40786
HUSTAD INVESTMENTS, LP,                                   BKY 13-40788

                        Debtors.                          Chapter 11 Cases

---

**UNSWORN CERTIFICATE OF SERVICE**

---

I, Michael L. Meyer, declare under penalty of perjury that on April 11, 2013, copies of Debtors':

1.    Notice of Hearing and Motion to Approve the Sale of Real Property Free and Clear of Interests;
2.    Memorandum of Law; and
3.    Proposed Order Approving the Sale of Real Property Free and Clear of Interests;

were served by sending to each party a copy thereof as noted on the attached Service List.


Dated:  April 11, 2013                           /e/  Michael L. Meyer, 72527



{00135824  }

ELECTRONIC
HUSTAD INVESTMENT CORPORATION
ATTN  ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
HUSTAD REAL ESTATE COMPANY
ATTN  ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
HUSTAD INVESTMENTS LP
ATTN  ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

MICHAEL FADLOVICH
UNITED STATES TRUSTEE
1015 US COURTHOUSE
300 SOUTH FOURTH STREET
MINNEAPOLIS MN  55415

MINN DEPT OF REVENUE
COLLECTION ENFORCEMENT
551 BANKRUPTCY / P O 64447
ST PAUL MN 55164

INTERNAL REVENUE SERVICE
ATTN SPECIAL PROCEDURES
WELLS FARGO PL STOP 5700
30 EAST SEVENTH
ST PAUL MN 55101

IRS DISTRICT COUNSEL
650 GALTIER PLAZA
380 JACKSON STREET
ST PAUL MN 55101

US ATTORNEY
600 U S COURTHOUSE
300 SOUTH FOURTH STREET
MINNEAPOLIS MN 55415

ELECTRONIC
ESTATE OF WALLACE H HUSTAD
ATTN  CINDY UTTERBACK
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
TREK DEVELOPMENT
ATTN ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
FREDRIKSON & BYRON P A
ATTN  JOHN KONECK
200 SOUTH SIXTH STREET  STE 4000
MINNEAPOLIS MN 55402

ELECTRONIC
ANTHONY OSTLUND BAER & LOUWAGIE
ATTN  CHERYL STANTON
90 SO SEVENTH STREET  STE 3600
MINNEAPOLIS MN 55402

ELECTRONIC
BASSFORD REMELE P A
ATTN  LEWIS A REMELE JR
33 SO SIXTH STREET  STE 3800
MINNEAPOLIS MN 55402

ELECTRONIC
ELISABETH HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
KRISTEN KUELBS
9543 GREY WIDGEON PLACE
EDEN PRAIRIE MN 55347

ELECTRONIC
ANDERSON ZURMUEHLEN CPAS
ATTN  CINDY UTTERBECK
828 GREAT NORTHERN BLVD
P O BOX 1040
HELENA MT 59624-1040

BLUE CROSS/BLUE SHIELD
P O BOX 64179
ST PAUL MN 55164

ELECTRONIC
MYTECH PARTNERS
ATTN  LYF WILDENBERG
2420 LONG LAKE ROAD
ST PAUL MN 55113

ELECTRONIC
LAW OFFICES OF JAY F COOK
ATTN  JAY F COOK
5150 N TAMIAMI TRAIL  STE 201
NAPLES FL 34103

CITY OF MAPLE GROVE
ATTN  KEN ASHFELD
P O BOX 1180
MAPLE GROVE MN 55311

ELECTRONIC
RLK INCORPORATED
ATTN  MARY GRAUNKE
6110 BLUE CIRCLE DRIVE  STE 10
MINNETONKA MN 55343

ELECTRONIC
DORSEY & WHITNEY
ATTN  JOE McLEOD
50 SO SIXTH STREET  STE 1500
MINNEAPOLIS MN 55402

ELECTRONIC
FRUTH JAMISON & ELSASS PLLC
ATTN DOUGLAS ELSASS
80 SO EIGHTH STREET  STE 3902
MINNEAPOLIS MN 55402

SKOLNICK & SHIFF P A
ATTN  WILLIAM SKOLNICK
527 MARQUETTE AVE SO  STE 2100
MINNEAPOLIS MN 55402

ELECTRONIC
BMO HARRIS BANK N A
C/O B GURSTELLE / J McDONALD
BRIGGS AND MORGAN P A
80 SOUTH EIGHTH STREET  STE 2200
MINNEAPOLIS MN 55402

ELECTRONIC
RUTH K HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
RUTH K HUSTAD
C/O J KONECK / C CUTLER / S GIBBS
FREDRIKSON & BYRON P A
200 SOUTH SIXTH STREET  STE 4000
MINNEAPOLIS MN 55402

ELECTRONIC
CENTRAL BANK
C/O ORIN J KIPP
WILFORD GESKE & COOK PA
8425 SEASONS PARKWAY  STE 105
WOODBURY MN 55125-4393

ELECTRONIC
GELLER INDUSTRIES LLC
C/O TIMOTHY R GECK
GECK DUEA & OLSON PLLC
4770 WHITE BEAR PARKWAY  STE 100
WHITE BEAR LAKE MN 55110

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    **Substantively Consolidated Under**
                                                          **BKY 13-40789**

HUSTAD INVESTMENT CORPORATION,                            BKY 13-40789
HUSTAD REAL ESTATE COMPANY,                               BKY 13-40786
HUSTAD INVESTMENTS, LP,                                   BKY 13-40788

                        Debtors.                          Chapter 11 Cases

**ORDER APPROVING THE SALE OF REAL PROPERTY
FREE AND CLEAR OF INTERESTS**

This matter came on for hearing on the motion of Debtor for the entry of an order authorizing and approving the sale of real property free and clear of liens.  Appearances were noted in the record.  This Court having determined that granting relief requested in the motion is in the best interest of the Debtor, its estate, and creditors; it appearing that proper and adequate notice has been given; and after finding that good and sufficient cause appears therefor upon the record herein; it is hereby

ORDERED:

1.       The Debtor is authorized to enter into the Purchase Agreement with Geller Industries, LLC in the form attached to the motion as Exhibit A.

2.       Pursuant to 11 U.S.C. § 363(f), the Real Property shall be transferred to the Buyer, in accordance with the Purchase Agreement.  Further, aside from any liability expressly assumed by the Buyer in the Purchase Agreement, the transfer shall be free and clear of  all interests in the Real Property, including claims (as defined in section 101(5) of the Bankruptcy Code), claims of equity security holders (as defined in Section 101(17) of the Bankruptcy Code), security interests, liens (as defined in section 101(37) of the Bankruptcy Code, and including, but not limited to, mechanics',

{00135671  }

materialmen's, or other consensual or statutory liens, or any other lien of any kind), or any other

encumbrance or interest of any kind, whether such encumbrance or interest arises by statute, at

common law, or otherwise.

**3.**     All liens against the Real Property will transfer to the proceeds of sale which shall be

held by the Debtor pending further order of the Court.

**4.**     Notwithstanding Bankruptcy Rule 6004(h), this Order is effective immediately.


Dated:

_____

Kathleen H. Sanberg
United States Bankruptcy Court Judge