UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Substantively Consolidated Under** **BKY 13-40789** |
| HUSTAD INVESTMENT CORPORATION, | BKY 13-40789 |
| HUSTAD REAL ESTATE COMPANY, | BKY 13-40786 |
| HUSTAD INVESTMENTS, LP, | BKY 13-40788 |
| Debtors. | Chapter 11 Cases |

## NOTICE OF HEARING AND MOTION TO APPROVE
## BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT
## FOR SALE OF MAPLE GROVE RESIDENTIAL PROPERTY
## FREE AND CLEAR OF INTERESTS

TO:     The entities specified in Local Rule 9013-3

**1.**     The above named debtors (together, the "Debtor"), through their undersigned attorneys, move the court for the relief requested below and give notice of hearing.

**2.**     The court will hold a hearing on this motion at **10:00 a.m. on April 30, 2013** (the "Hearing") before the Honorable Kathleen H. Sanberg, Courtroom 8 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415.

**3.**     Any response to this motion relating to bidding procedures or the form of the purchase agreement must be filed and served not later than **April 25, 2013**, which is five (5) days prior to the time set for the hearing.  The date of the hearing on the sale and the assumption and assignment of related contracts and deadlines for responsive papers will be set at a later time.  **Unless a response opposing the motion is timely filed, the Court may grant the motion without a hearing.**

**4.**     This court has jurisdiction over this motion pursuant to 28 U.S.C. § 157 and 1334, Bankruptcy Rule 5005 and Local Rule 1070-1.  This proceeding is a core proceeding.  The petitions

commencing these chapter 11 cases were filed on February 20, 2013. The case is now pending in this Court.

     **5.**     This motion arises under § 363 of the Bankruptcy Code, and Fed. R. Bankr. P. 2002, 6004, 6006, 9007 and 9014. Movant requests that this Court enter an order authorizing and approving bidding procedures and a form of purchase agreement in connection with the Debtor's intended sale of 35.5 acres of land in Maple Grove, MN, entitled for development of 77 single-family residential lots commonly known as the Hamlets.

## BACKGROUND

     **6.**     On February 20, 2013, the debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The debtors continue in the management and possession of their properties as debtors-in-possession.

     **7.**     The debtors are engaged in the business of real estate investment. Among other real property, they are the owners of two development projects: a commercial development with remaining developed lots consisting of 8+/- acres in Eden Prairie, MN called Bluff Country Village, and a mixed-use development consisting of 110+/- acres in Maple Grove, MN (the "Maple Grove Property"). Both Bluff Country Village and the Maple Grove Property are subject to a first mortgage in favor of BMO Harris Bank, N.A. ("BMO") securing a debt of approximately $12.4 million, including principal of approximately $10.8 million, interest, late fees, attorney fees and costs.

     **8.**     Ownership of the properties is split among the Debtors. The majority of Bluff Country Village is owned by Hustad Investment Corporation ("HIC"), but some of that property is owned by Hustad Real Estate Company ("HRE"). The Maple Grove Property is owned by Hustad Investments, LP ("HILP").

     **9.**     On April 3, 2013, the Bankruptcy Court entered an order substantively consolidating these cases into one case (HIC docket no. 47).

10.     The Debtors intend to continue the development and sale of their properties to maximize the value of those assets for the benefit of creditors and equity holders.  The strategy to do so will be integrated and involve staged sales of parcels in both Bluff Country Village and the Maple Grove Property.

11.     The proposed sale of the Maple Grove residential property is the first step in that process.

12.     The Maple Grove residential property consists of 35.5 acres of land in Maple Grove, MN, entitled for development of 77 single-family residential lots commonly known as the Hamlets. The property is ready for grading and construction of public infrastructure by the City and then for a residential developer/builder to build and sell homes. As described below, agreements necessary for development of the property have been negotiated with the City of Maple Grove.

## PROPOSED SALE OF PROPERTY

A.     **Overview of Proposed Sale Process**

13.     The Debtor proposes to sell the Maple Grove residential property by issuing a request for proposal to interested parties, accepting bids by a bid deadline, holding an auction among the bidders to determine the highest price, and, assuming the price to be acceptable to the Debtor, then submitting the winning bid to the Court for necessary approval.

14.     The Debtor requests authority to sell the Maple Grove residential property free and clear of liens, claims and other interests.  Through this motion, Debtor requests an order approving bidding procedures (the "Bidding Procedures") for the proposed sale as described in the Request for Proposal ("RFP") attached as **Exhibit 1**.  Debtor also requests an order approving the proposed form of Purchase Agreement (the "Purchase Agreement"), a copy of which is attached as **Exhibit 2**.

15.     The Debtor requests that the Court schedule a hearing (the "Sale Hearing") to approve sale of the Maple Grove residential property pursuant to the RFP and the assignment of related contracts to the buyer.

**B.     Bidding Procedures, Bid Protection and Asset Purchase Agreement**

16.     The Debtor has received indications of interest in purchasing the Maple Grove residential property from multiple parties.  As a result, the Debtor believes that the RFP will result in multiple offers.  There is some urgency to this sale process because of the grading necessary to make the property ready for construction of City infrastructure.  If the final grading can be completed by June, the infrastructure can be completed by July or August and construction of residences can commence in late August, thereby enhancing the value of the property to the buyer.

17.     As described in more detail in the RFP, the Debtor is requesting that initial bids be submitted by an early date, May 15, 2013[1] (the "Bid Deadline"), in the form of a signed Purchase Agreement.

18.     In order to participate in the sale process, each bidder must deliver to the Debtor:

    a)     an executed Purchase Agreement in the form approved by the Court; and

    b)     Financial disclosure in a form acceptable to Debtor demonstrating the bidder's ability to close the proposed transaction.

Copies of each such bid (a "Qualified Bid") will be distributed promptly to counsel for BMO.  The Debtor may extend the Bid Deadline once or successively, but is not obligated to do so.

19.     After all Qualified Bids have been received, the Debtor intends to conduct an auction (the "Auction") if more than one Qualified Bid is received.  Subject to Court approval, the Debtor will notify all bidders who have submitted Qualified Bids of the time of the auction which will take

---

1  Due to the urgency of the schedule the Debtor has already begun the process of soliciting bids subject to Court approval of this process.

place at the office of the Debtor's counsel.  Only a bidder who has submitted a Qualified Bid and BMO will be eligible to attend the auction.

20.     Upon the auction's conclusion, the Debtor, in consultation with BMO, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) notify the highest and otherwise best offer or group of offers for the assets (the "Successful Bid"). Debtor shall present the Successful Bid to the Court for approval at the Sale Hearing.  Such sale or sales will be free and clear of all interests in the Maple Grove residential property.  The Debtor reserves the right to reject all bids if they are not adequate.

21.     The above-described procedures are in the best interests of the Debtor and its estate and creditors since they will result in the maximum value available for the property to be sold.

### RELATED CONTRACTS

22.     Debtor has negotiated, but not executed, a Development Agreement and a Planned Unit Development Agreement (the "Agreements") with the City of Maple Grove.  Copies of the Agreements are attached as **Exhibits 3 and 4.**  The Debtor will seek to assume and assign the Agreements to the buyer of the property.  The Debtor requests that the Court authorize it to enter into the Agreements in connection with the proposed sale transaction.

23.     While the Debtor believes the Agreements to be within the ordinary course of its business, it seeks Court authorization regarding them in an abundance of caution.

24.     If necessary, Debtor will call Elisabeth Hustad, Debtor's President, as a witness in connection with this motion.

WHEREFORE, Debtor requests that the Court enter an Order:

a)  approving the Bidding Procedures and form of Purchase Agreement as set forth in the Motion;

-5-

b)  authorizing the Debtor to enter into the Agreements; and

c)  granting such further relief as the Court deems just and equitable.

Dated:  April 16, 2013                    RAVICH MEYER KIRKMAN
                                          McGRATH NAUMAN & TANSEY,
                                          A PROFESSIONAL ASSOCIATION

                                          By      /e  Michael L. Meyer (72527)
                                                   Will R. Tansey (323056)

                                          4545 IDS Center
                                          80 South Eighth Street
                                          Minneapolis, MN 55402

                                          ATTORNEYS FOR DEBTORS

**VERIFICATION**

I, Elisabeth R. Hustad, the President and Chief Executive Officer of Hustad Investment

Corporation and Hustad Real Estate Company, which is the sole general partner of Hustad

Investments, LP, declare under penalty of perjury that the facts set forth in the foregoing Notice

of Hearing and Motion to Approve Bidding Procedures and Form of Asset Purchase Agreement

for Sale of Maple Grove Residential Property Free and Clear of Interests are true and correct

according to the best of my knowledge, information and belief.

Executed on:  April ___, 2013

Elisabeth R. Hustad

# EXHIBIT 1

April ___, 2013

_____

_____

_____

    Re:    Request for Proposal with respect to possible sale and purchase of land located at Highway 101 and Bass Lake Road, Maple Grove, Minnesota

Dear _____:

    On behalf of Hustad Investments, LP ("Hustad") and Trek Development, Inc. ("Trek"), enclosed is a project booklet containing the approved overall concept plan and other materials listed on the attached Schedule 1 relating to land owned by Hustad located at Highway 101 and Bass Lake Road in Maple Grove, Minnesota (the "Land"). The portion of the Land designated "South Residential" on the concept plan (the "Residential Land"), generally known as "The Hamlets at Rush Creek", is being offered for sale as described in this letter. The City of Maple Grove, Minnesota has approved a PUD Development Stage Plan and a Preliminary Plat of 77 single-family lots and homes for the Residential Land.

    Hustad and Trek are soliciting offers for the purchase of the Residential Land by a residential builder/developer. The form of Purchase and Sale Agreement on which offers are to be submitted by interested parties is included in the enclosed booklet. If you are interested in purchasing the Residential Land, you should execute and submit your offer on the form Purchase and Sale Agreement on or before May 15, 2013 (the "Bid Deadline"). Please note than in completing the Purchase and Sale Agreement, you need to complete the following blanks:

    (i)    First paragraph on top of page 1: insert full and accurate legal name of Buyer, type of entity Buyer is, and its state of formation (e.g., XYZ Corporation, a Delaware corporation);

    (ii)    Section 2: insert purchase price;

    (iii)    Section 9: insert type of entity Buyer is and its state of formation;

    (iv)    Section 13: insert name, address and fax # of Buyer for notices to Buyer, and person to whose attention notices to Buyer should be sent (include any additional party or person which or who should be copied with notices to Buyer);

    (v)    Signature page: insert name of Buyer and have the appropriate person(s) execute the Agreement on behalf of Buyer (do same on Escrow Receipt appended to and appearing as last 2 pages of the Agreement); and

    (vi)    Escrow Receipt: insert tax identification number of Buyer, and complete signature block and execute as noted above.

In addition, the offer must be accompanied by financial disclosure demonstrating your ability to close the proposed transaction.

    All offers should be submitted to Beth Hustad at Trek Development, Inc., 10470 White Tail Crossing, Eden Prairie, MN  55347.

{00135138 }

In the event that Hustad receives offers from more than one qualified bidder by the Bid Deadline, an auction will be held at a time and place to be determined at which only qualified parties who have submitted offers will be allowed to participate. Subject to and except as provided in the following paragraph, the highest bid at the auction will be accepted subject to Bankruptcy Court approval in Hustad's chapter 11 case.

Hustad is not obligated to accept any offer and can reject any offer for no reason or for any reason, nor is Hustad obligated to enter into negotiations with respect to any offer, nor is Hustad obligated to enter into a Purchase and Sale Agreement in the event it enters into negotiations with respect to any offer.  Hustad will be obligated to sell the Residential Land if and only if it and a buyer execute and deliver a Purchase and Sale Agreement, and in such case the rights and obligations of Hustad and such buyer shall be as set forth in and governed by the terms and provisions of such Purchase and Sale Agreement.

If you have any questions, please contact the undersigned at 952-914-9610.

Sincerely,


_____

Elisabeth R. Hustad
President, Hustad Real Estate Company,
General Partner of Hustad Investments, LP, and
President, Trek Development, Inc.


Enclosures
cc:    Jay F. Cook

{00135138  }

## SCHEDULE 1

## [COMPLETE]

**EXHIBIT 2**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("this Agreement") is made as of _____, 2013 (the "Effective Date"), between HUSTAD INVESTMENTS, LP, a Minnesota limited partnership and debtor-in-possession in the Chapter 11 case of In re HUSTAD INVESTMENTS, LP, (the "Chapter 11 Case"), Case No. BKY 13-40788, pending in the U.S. Bankruptcy Court, District of Minnesota ("Seller"), and _____, a _____ ("Buyer").

Seller and Buyer agree as follows:

1.     <u>Sale of Property</u>.  Subject to and upon the terms and conditions contained herein, Seller agrees to sell to Buyer, and Buyer agrees to buy from Seller, the real property located in Hennepin County, Minnesota, containing approximately 37.4 acres of land (including wetlands and Vagabond Road), shown as "South Residential" on the Concept Site Plan attached hereto as <u>Exhibit A</u> and legally described as Outlots G, H, and I, The Markets at Rush Creek, according to the plat thereof recorded or to be recorded (the "Land"), together with all easements and rights, if any, appurtenant to the Land (collectively, the "Property").

2.     <u>Purchase Price and Manner of Payment</u>.  The total purchase price (the "Purchase Price") to be paid by Buyer to Seller for the Property shall be _____ Dollars ($_____).  The Purchase Price shall be payable as follows:

2.1.     The sum of $100,000, in immediately available funds, as an initial deposit of earnest money ("Initial Deposit", which term shall include any interest earned thereon), shall be deposited by Buyer with First American Title Insurance Company ("Escrow Agent" or "Title Company"), upon the execution and delivery of this Agreement.  If, on or before the Contingency Date (as defined in Section 3.1 hereof and as it may have been extended pursuant to Section 3.2 hereof), Buyer has not terminated this Agreement in accordance with the provisions of Section 3.1 or Section 3.2 below, then on or before the Contingency Date (as it may have been extended pursuant to Section 3.2 hereof), Buyer shall make an additional deposit of earnest money in the amount of $150,000, in immediately available funds, with Escrow Agent (the "Additional Deposit") (the Initial Deposit and the Additional Deposit are referred to collectively as the "Earnest Money", which term shall include any interest earned thereon).  If Buyer fails to make the Additional Deposit as provided above, Seller may terminate this Agreement and retain the Initial Deposit by giving written notice of such termination to Buyer at any time after the Contingency Date (as it may have been extended pursuant to Section 3.2 hereof).  The Earnest Money shall be deposited with and held by Escrow Agent in accordance with the Escrow Receipt among Seller, Buyer and Escrow Agent attached hereto.

2.2.     The balance in cash or by wire transfer of funds on the Closing Date.

3.     <u>Contingencies</u>.  The obligations of Buyer under this Agreement are contingent upon the following:

3.1.   <u>Inspection</u>.  Seller shall allow Buyer, and Buyer's employees, agents and contractors, access to the Property without charge and at all reasonable times during the period commencing on the Effective Date and continuing to and including the date twenty-five (25) days after the Effective Date (the "Contingency Date"), for the purpose of Buyer's investigation and testing of the same, including, but not limited to, surveys, soil borings, and environmental investigation and testing, and conducting such other investigations, tests, studies and activities as Buyer deems necessary or advisable, and Seller shall make available to Buyer without charge any and all surveys, and soils, engineering, wetlands and environmental studies and reports, relating to the Property and in Seller's possession, and Buyer shall have determined, on or before the Contingency Date, that Buyer is satisfied, in its sole and absolute discretion, with the results of such investigation and testing and Buyer's review of any such materials provided by Seller to Buyer.  In the event that Buyer is not satisfied with the results of such investigation and Buyer's review of any such materials provided by Seller to Buyer, Buyer may terminate this Agreement by giving written notice of such termination to Seller on or before the Contingency Date.  In the event of such termination, neither party will have any further rights or obligations under this Agreement, and the Initial Deposit shall be returned to Buyer.

Buyer shall conduct all such investigations, tests, studies and activities on the Property in a commercially reasonable manner.  Buyer shall not perform any invasive environmental testing or investigation without the prior written consent of Seller, which consent may not be unreasonably withheld, and which consent may be reasonably conditioned.  Buyer shall pay all costs and expenses of such investigation, testing and review, and shall hold and indemnify Seller and the Property harmless from and against all costs and liabilities relating to Buyer's activities and such investigations, testing and review, and shall pay and reimburse Seller for any damage caused by the same.  Buyer shall minimize any damage to the Property and shall promptly repair and restore any damage to the Property caused by or occurring during Buyer's investigation and testing and return the Property to substantially the same condition as existed prior to Buyer's entry on the Property and such investigation and testing.  Buyer shall promptly repair or alleviate any dangerous condition on the Property caused by Buyer's activities thereon.  Buyer shall provide copies to Seller of all reports and other materials relating to or resulting from Buyer's investigation and testing hereunder, promptly upon receipt or creation thereof by Buyer.

3.2.   <u>Governmental Approvals and Related Actions</u>.   On or before the Contingency Date, (i) the City Council of the City of Maple Grove, Minnesota (the "City") shall have approved the execution and delivery by the City and either Seller and/or Trek Development, Inc. ("Trek") or Buyer of, and, if Seller and/or Trek, the assignment to, and assumption by Buyer of the rights and obligations of Seller and/or Trek under, the Development Agreement (the "Development Agreement") in substantially the form of <u>Exhibit B</u> attached hereto, and the Planned Unit Development Agreement (the "PUD Agreement") in substantially the form of <u>Exhibit C</u> attached hereto; and (ii) the City Council of the City shall have approved the plat of The Hamlets at Rush Creek (the "Plat") in substantially the form of <u>Exhibit D</u> attached hereto.  The form and substance of the Agreement pursuant to which any such assignment to and

assumption by Buyer of the rights and obligations of Seller and/or Trek under the Development Agreement and the PUD Agreement is effectuated shall be subject to the approval of the City, Seller and/or Trek and Buyer, and such Agreement shall include a release of Seller and/or Trek from any liability under the Development Agreement and the PUD Agreement.  Seller and Buyer shall cooperate and work with each other in good faith and in all reasonable respects to obtain such approvals.  In the event that the contingency set forth in this Section 3.2 has not been satisfied or waived by Buyer on or before the Contingency Date, Buyer may terminate this Agreement by giving written notice of such termination to Seller on or before the Contingency Date.  In the event of such termination, neither party will have any further rights or obligations under this Agreement, and the Initial Deposit shall be returned to Buyer.  Notwithstanding the foregoing, in the event that notwithstanding the good faith, reasonable efforts of Seller and Buyer, the contingency set forth in this Section 3.2 has not been satisfied or waived by Buyer on or before the Contingency Date, either Seller or Buyer may extend the Contingency Date, solely for purposes of satisfying the contingency set forth in this Section 3.2, for a period of thirty (30) days by giving written notice of such extension to the other party on or before the Contingency Date.  In the event of any such extension and in the further event that the contingency set forth in this Section 3.2 has not been satisfied or waived by Buyer on or before the Contingency Date as so extended, Buyer may terminate this Agreement by giving written notice of such termination to Seller on or before the Contingency Date as so extended.  In the event of such termination, neither party will have any further rights or obligations under this Agreement, and the Initial Deposit shall be returned to Buyer.

3.3.    Bankruptcy Court Approval.  On or before the Outside Closing Date, the sale of the Property to Buyer shall have been approved by the Bankruptcy Court in the Chapter 11 Case by means of an order satisfactory in form to Buyer ("Bankruptcy Court Approval").  In the event that the contingency set forth in this Section 3.3 has not been satisfied on or before the Outside Closing Date, either Seller or Buyer may terminate this Agreement by giving written notice of such termination to the other party within five (5) days after the Outside Closing Date.  In the event of such termination, neither party will have any further rights or obligations under this Agreement, and the Earnest Money shall be returned to Buyer.

3.4.    Contingencies for Benefit of Buyer.  The contingencies described in Section 3.1 and Section 3.2 above are specifically for the benefit of Buyer, and Buyer shall have the right to waive any such contingency by written notice to Seller.

4.    Closing.  Subject to the satisfaction of the contingency set forth in Section 3.3 above, the closing of the purchase and sale contemplated by this Agreement (the "Closing") shall occur on the date (the actual date of closing being herein referred to as the "Closing Date") agreed upon by Buyer and Seller after the contingencies set forth in Section 3.1 and 3.2 above have been satisfied or waived by Buyer; provided that in no event shall the Closing Date be more than ten (10) days after the Contingency Date as it may have been extended pursuant to Section 3.2 hereof (the "Outside Closing Date").  The Closing shall take place at such place as Buyer and Seller may agree.  Seller agrees to deliver possession of the Property to Buyer on the Closing Date.

4.1.  <u>Seller's Closing Documents</u>.  On the Closing Date, Seller will execute and/or deliver to Buyer the following (collectively, "Seller's Closing Documents"), all in form and content reasonably satisfactory to Buyer:

4.1.1  <u>Deed</u>.  A Limited Warranty Deed, conveying the Property to Buyer, free and clear of all encumbrances, except the Permitted Encumbrances (as hereinafter defined).

4.1.2  <u>FIRPTA Affidavit</u>.  A non-foreign affidavit, properly executed, containing such information as is required by Internal Revenue Code Section 1445(b)(2) and its regulations.

4.1.3  <u>Well Certificate</u>.  A certificate signed by Seller, or statement on the Limited Warranty Deed signed by Seller, warranting that to Seller's actual knowledge there are no wells on the Property within the meaning of Minn. Stat. § 103I, or if there are any such wells, a well certificate in the form required by law.

4.1.4  <u>Storage Tanks</u>.  If the Property contains or contained a storage tank, an affidavit with respect thereto, as required by Minn. Stat. § 116.48.

4.1.5  <u>Assignment and Assumption Agreement</u>.  If Seller and/or Trek rather than Buyer has/have executed and delivered the Development Agreement and/or the PUD Agreement, an Assignment and Assumption Agreement, consented to by the City, pursuant to which Seller and/or Trek assigns to Buyer and Buyer assumes all of the rights and obligations of Seller and/or Trek under the Development Agreement and/or the PUD Agreement and Seller and/or Trek is/are released from liability thereunder (the "Assumption and Assumption Agreement").

4.1.6  <u>Title Documents</u>.  Such affidavits of seller or other documents as may be reasonably required by the Title Company in order to record the Seller's Closing Documents and issue a title policy to Buyer pursuant to the Title Commitment (as hereinafter defined).

4.1.7  <u>Other Documents</u>.  All other documents reasonably determined by Buyer or the Title Company to be necessary to transfer the Property to Buyer free and clear of all encumbrances, except the Permitted Encumbrances.

4.2.  <u>Buyer's Closing Deliveries</u>.  On the Closing Date, Buyer will execute and/or deliver to Seller the following (collectively, "Buyer's Closing Deliveries"):

4.2.1  <u>Purchase Price</u>.  The Purchase Price, in immediately available funds.

4.2.2  <u>Assignment and Assumption Agreement</u>.  The Assignment and Assumption Agreement.

-4-

4.2.3   <u>Title Documents</u>.   Such affidavits of purchaser, certificates of value or other documents as may be reasonably required by the Title Company in order to record the Seller's Closing Documents and issue a title policy to Buyer pursuant to the Title Commitment.

5.      <u>Costs and Expenses; Prorations</u>.   Seller and Buyer agree to the following prorations and allocation of costs and expenses regarding this Agreement:

5.1.    <u>Title Insurance, Survey and Closing Fee</u>.   Seller will pay all costs of the Title Commitment (as hereinafter defined), and Buyer will pay the premium for the title policy issued to Buyer pursuant to the Title Commitment.   Buyer will pay the cost of the New Survey (as hereinafter defined).   Seller and Buyer will each pay one-half (1/2) of any closing fee or charge imposed by the Title Company.

5.2.    <u>Deed Tax; Mortgage Registry Tax</u>.   Seller shall pay all state deed tax on the Limited Warranty Deed to be delivered by Seller under this Agreement.   Buyer shall pay all mortgage registry tax relating to any mortgage financing obtained by Buyer.

5.3.    <u>Real Estate Taxes and Special Assessments</u>.   Seller will pay all special assessments levied against the Property as of the date hereof, including without limitation, any installments thereof payable with general real estate taxes payable in the year in which Closing occurs and prior years.   Except as provided in the preceding sentence, Buyer will assume and pay all special assessments levied, pending, deferred or constituting a lien against the Property as of the Closing Date, including without limitation, all special assessments contemplated by the Development Agreement. General real estate taxes payable in all years prior to the year in which Closing occurs, and installments of special assessments payable therewith, will be paid by Seller. General real estate taxes payable in the year in which Closing occurs will be prorated between Buyer and Seller as of the Closing Date, based on a calendar fiscal year.   Buyer will pay all general real estate taxes payable in the year after the year in which Closing occurs and in all subsequent years.

5.4.    <u>Recording Costs</u>.   Seller will pay the cost of recording all documents necessary to place record title in the condition to be warranted by Seller pursuant to the Limited Warranty Deed to be delivered by Seller under this Agreement.   Buyer will pay the cost of recording all other documents, including, without limitation, the Limited Warranty Deed, the Development Agreement, the PUD Agreement, the Assignment and Assumption Agreement (if applicable), and the Plat.

5.5.    <u>Other Costs</u>.   All other operating costs of the Property, if any, will be allocated between Seller and Buyer as of the Closing Date, so that Seller pays that part of such other operating costs incurred before or payable with respect to the period prior to the Closing Date, and Buyer pays that part of such operating costs incurred or payable with respect to the period from and after the Closing Date.

5.6.    <u>Attorneys' Fees</u>.   Each of the parties will pay its own attorneys' fees, except that a party defaulting under this Agreement or any document delivered pursuant

hereto will pay the reasonable attorneys' fees and court costs incurred by the non-defaulting party to enforce its rights regarding such default.

6.    _Title Examination_.  Title Examination will be conducted as follows:

6.1.    _Title Evidence_.  On or before the date ten (10) days after the Effective Date, Seller, at Seller's sole cost and expense, shall provide to Buyer a commitment (the "Title Commitment") for a title insurance policy, issued by the Title Company.  Seller has provided or made available to Buyer an ALTA survey of the real estate of which the Property is a part.  Buyer, at its cost and expense, may obtain a current survey (the "New Survey") of the Land prepared by a registered land surveyor and complying with Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys (2011).

6.2.    _Buyer's Objections_.  At any time on or before the Contingency Date (without any extension thereof being considered for purposes of this Section 6.2), Buyer may make written objections (the "Title Objections") to the form and/or content of the Title Commitment.  Buyer's failure to make the Title Objections within such time period will constitute waiver of the Title Objections.  Buyer may not object to the matters listed on _Exhibit E_ attached hereto if and to the extent they affect the Property, and such matters and any other matter shown by or on the Title Evidence and not objected to by Buyer shall be a "Permitted Encumbrance" hereunder.  Seller will have until the Closing Date to cure the Title Objections, and Seller shall use commercially reasonable efforts to correct the Title Objections on or prior to the Closing Date.  Notwithstanding the provisions of the immediately preceding sentence, to the extent a Title Objection is in the nature of a mortgage or similar lien against the Property, Seller shall not be obligated to obtain a release of the Property therefrom, and to satisfy any condition to such release, until Closing, but shall be obligated to do so by Closing.  If the Title Objections are not cured by Closing, Buyer will have the option to either terminate this Agreement or to extend (and thereafter further extend) the date by which the Title Objections must be cured but in no event to a date later than thirty (30) days after the last day on which the Closing Date may occur pursuant to the provisions of Section 4 hereof.  If the date by which the Title Objections are to be cured has been extended, and the Title Objections are not cured on or before the extended date for the cure thereof, Buyer will have the option to do either of the following:

6.2.1   Terminate this Agreement.

6.2.2   Waive the Title Objections and proceed to close.

If Buyer elects to terminate this Agreement pursuant to this Section 6.2, neither party will have any further rights or obligations under this Agreement, and the Earnest Money shall be returned to Buyer.

7.    _Executory Period_.  During the period from the date of Seller's acceptance of this Agreement to the Closing Date (the "Executory Period"), except for the Development Agreement and the PUD Agreement, Seller shall not execute any contracts, leases or other agreements regarding the Property that are not terminable on or before the Closing Date, without

the prior written consent of Buyer, which consent may be withheld by Buyer at its sole discretion.

8.  Representations and Warranties by Seller.  Seller represents and warrants to Buyer that:

8.1.  Limited Partnership; Authority.  Seller is duly formed as a limited partnership and is in good standing under the laws of the State of Minnesota; subject to Bankruptcy Court Approval, Seller has the requisite power and authority to enter into and perform this Agreement and Seller's Closing Documents; subject to Bankruptcy Court Approval, this Agreement and such Documents have been duly authorized by all necessary action on the part of Seller and have been or will be duly executed and delivered by Seller; the execution, delivery and performance by Seller of this Agreement and such Documents do not conflict with or result in a violation of Seller's formation documents, or any judgment, order, or decree of any court or arbiter to which Seller is a party; and subject to Bankruptcy Court Approval, this Agreement and such Documents are and will be valid and binding obligations of Seller, and are and will be enforceable against Seller in accordance with their terms.

8.2.  Rights of Others to Purchase the Property.  Seller has not entered into any other contracts for the sale of the Property which are currently in force and effect, nor are there any rights of first refusal or options to purchase the Property or any other similar rights of others that would prevent the consummation of the transactions contemplated by this Agreement.

8.3.  FIRPTA.  Seller is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code.

8.4.  Wells.  Seller does not know of any "wells" on the Property within the meaning of Minn. Stat. § 103I.

8.5.  Storage Tanks.  To Seller's actual knowledge, no above ground or underground tanks are located in or about the Property.

8.6.  Individual Sewage Treatment Systems.  To Seller's actual knowledge, there is no "individual sewage treatment system" within the meaning of Minn. Stat. § 155.55 on or serving the Property.

Seller will indemnify Buyer, its successors and assigns, against, and will hold Buyer, its successors and assigns, harmless from, any expenses or damages, including reasonable attorneys' fees, that Buyer incurs because of the breach of any of the above representations and warranties, for a period of six (6) months after Closing.  Except for the express representations and warranties contained in this Section 8, Buyer is purchasing the Property based upon its own investigation and inquiry and is not relying on any representation and warranty of Seller or other person and is agreeing to accept and purchase the Property "as is, where is, with all faults".

9.     <u>Representations and Warranties by Buyer</u>.  Buyer represents and warrants to Seller that Buyer is duly formed as a _____ and is in good standing under the laws of the State of _____; that if Buyer's state of formation is not Minnesota, Buyer is duly qualified to transact business in, and in good standing under the laws of, the State of Minnesota; that Buyer has the requisite power and authority to enter into this Agreement and the Buyer's Closing Deliveries to be signed by it; that this Agreement and such Deliveries have been duly authorized by all necessary action on the part of Buyer and have been or will be duly executed and delivered by Buyer; that the execution, delivery and performance by Buyer of this Agreement and such Deliveries do not conflict with or result in a violation of Buyer's formation documents, or any judgment, order or decree of any court or arbiter to which Buyer is a party; this Agreement and such Deliveries are and will be valid and binding obligations of Buyer, and are and will be enforceable against Buyer in accordance with their terms.  Buyer will indemnify Seller, its successors and assigns, against, and will hold Seller, its successors and assigns, harmless from, any expenses or damages, including reasonable attorneys' fees, that Seller incurs because of the breach of any of the above representations and warranties.

10.    <u>Condemnation</u>.  If eminent domain proceedings are hereafter threatened or commenced against all or any substantial part (defined to mean 10% or more of the land area of the Property) of the Property, Seller shall promptly give written notice thereof to Buyer, and Buyer shall have the right to terminate this Agreement and receive back the Earnest Money by giving written notice of such termination to Seller within ten (10) days after Buyer's receipt of Seller's notice.  If Buyer shall fail to give such notice of termination, or if eminent domain proceedings are hereafter threatened or commenced against a part of the Property which is not a substantial part of the Property, then the parties shall proceed to Closing, and Seller shall assign to Buyer at Closing all rights to appear in and receive any award from such proceedings.

11.    <u>Brokers</u>.  Buyer represents and warrants to Seller that Buyer has dealt with no brokers, finders or the like in connection with this Agreement or the transactions contemplated hereby, except Trek Development, Inc.

12.    <u>Assignment; Survival</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Buyer may not assign its rights and obligations under this Agreement without the prior written consent of Seller, which consent may be given, withheld or conditioned by Seller in its sole and absolute discretion.

13.    <u>Notices</u>.  Any notice required or permitted hereunder shall be given by either (i) personal delivery upon an authorized representative of a party hereto, or (ii) United States registered or certified mail, return receipt requested, postage prepaid, or (iii) facsimile copy followed by mailed notice, or (iv) a nationally recognized, reputable overnight courier, in each case properly addressed as follows:

If to Seller:                    Hustad Investments, LP
                                 10470 White Tail Crossing
                                 Eden Prairie, MN  55347
                                 Attn:  Elisabeth R. Hustad
                                 Telephone (952) 941-4383
                                 Fax #:  (952) 941-7544

With a copy to:                Trek Development, Inc.
                               10470 White Tail Crossing
                               Eden Prairie, MN  55347
                               Attn:  Elisabeth R. Hustad
                               Telephone (952) 914-9610
                               Fax #:  (952) 941-7544

With a copy to:                Jay F. Cook, Esq.
                               Law Offices of Jay F. Cook, P.L.
                               5150 North Tamiami Trail, Suite 201
                               Naples, Florida 34103
                               Fax #:  (239) 687-2401

If to Buyer:                   _____
                               _____
                               _____
                               Attn: _____
                               Fax #: _____

With a copy to:                _____
                               _____
                               _____
                               _____
                               Fax #: _____

Notices shall be deemed effective on the earlier of the date of receipt or the date of deposit, as aforesaid; provided, however, that if notice is given by deposit, the time for response to any notice by the other party shall commence to run one business day after any such deposit.  Any party may change its address for the service of notice by giving notice of such change ten (10) days prior to the effective date of such change.

14.    Default; Remedies.  If Buyer defaults under this Agreement, Seller will provide written notice thereof to Buyer.  If Buyer fails to cure such default within ten (10) days after the date of such notice, this Agreement will terminate, and upon such termination Seller will retain the Earnest Money as liquidated damages, time being of the essence of this Agreement.  The termination of this Agreement and retention of the Earnest Money will be Seller's sole remedy for Buyer's default, and Buyer will not be liable for damages or for specific performance.  If Seller defaults under this Agreement, and such default continues for more than ten (10) days after Buyer gives written notice of such default to Seller, Buyer, as its sole and exclusive remedies, shall be entitled to (i) recover from Seller Buyer's actual, out-of-pocket costs, expenses and damages (but in no event any incidental, consequential, punitive or exemplary damages), not to exceed, however, the sum of Twenty-five Thousand and No/100 Dollars, and (ii) either (A) terminate this Agreement and receive back the Earnest Money, or (B) sue for specific performance of this Agreement, provided, however, that any such suit must be commenced not later than six (6) months after the date on which such cause of action arises.

15.    <u>Governing Law</u>.  This Agreement is to be construed and enforced according to and governed by the laws of the State of Minnesota.

16.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, which counterparts when considered together shall constitute one and the same agreement.

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be duly executed as of the date first written above.

SELLER:

HUSTAD INVESTMENTS, LP,
a Minnesota limited partnership

By: Hustad Real Estate Company,
    a Minnesota corporation
Its:  General Partner

By:_____
Name:  Elisabeth R. Hustad
Its:  President

BUYER:

_____

By:_____
Name:_____
Its:_____

EXHIBIT A

<u>Concept Site Plan</u>



EXHIBIT B

<u>Development Agreement</u>

EXHIBIT C

<u>PUD Agreement</u>

EXHIBIT D

<u>Plat of The Hamlets at Rush Creek</u>



EXHIBIT E

Permitted Encumbrances

1.      Real estate taxes and special assessments not yet due and payable.

2.      Easement for electric transmission line purposes, together with any incidental rights, in
        favor of The Rural Cooperative Power Association, as contained in the Right-of-Way
        Easement, dated May 12, 1955, recorded January 5, 1956, as Document No. 2987883 in
        Book 2076 Deeds, Page 478; and as modified by the Partial Release of Easement, dated
        April 21, 1989, recorded May 10, 1989, as Document No. 5532763.

3.      Easement for electric transmission line purposes, together with any incidental rights, in
        favor of The Rural Cooperative Power Association, as contained in the Right-of-Way
        Easement, dated July 30, 1956, recorded July 31, 1956, as Document No. 3020746 in
        Book 2097 Deeds, Page 428; and as modified by the Partial Release of Easement, dated
        October 24, 1983, recorded October 26, 1983, as Document No. 4839210.

4.      Easement for utility purposes, together with any incidental rights, in favor of the City of
        Maple Grove, as contained in the Utility Easement, dated September 5, 2001, recorded
        September 26, 2001, as Document No. 7548574.  Disclosure:  It is contemplated that
        pursuant to the PUD Agreement this Utility Easement will be vacated and terminated by
        the City of Maple Grove, Minnesota and that the sanitary sewer pipe installed pursuant to
        this Utility Easement will be abandoned in place and/or realigned.  Soils testing and
        correction in the vicinity of the abandoned and/or realigned sanitary sewer pipe may be
        advisable and necessary.

5.      Right-of-way for Vagabond Road.

6.      Development Agreement.

7.      PUD Agreement.

8.      Assignment and Assumption Agreement (if applicable).

9.      Drainage and utility easements as dedicated on the plat of The Hamlets of Rush Creek.

E-1

## ESCROW RECEIPT

The undersigned, First American Title Insurance Company ("Escrow Agent"), acknowledges receipt of $100,000.00 (the "Initial Deposit") to be held by it pursuant to the Purchase and Sale Agreement to which this Escrow Receipt is attached.  Escrow Agent agrees to hold the Initial Deposit and any Additional Deposit (collectively, the "Deposit") in accordance with the terms of the Purchase and Sale Agreement and disburse the same strictly in accordance with such terms.  Escrow Agent shall invest the Deposit in such interest-bearing accounts or instruments as shall be approved by both Buyer and Seller.  Interest shall accrue for the benefit of Buyer.

Seller and Buyer represent that their respective Tax ID Numbers are as follows:  Seller, _____; Buyer, _____.

Escrow Agent shall have no responsibility for any decision concerning performance or effectiveness of the Purchase and Sale Agreement or to resolve any disputes concerning the Purchase and Sale Agreement.  Escrow Agent shall be responsible only to act in accordance with the joint and mutual direction of both Seller and Buyer, or in lieu thereof, the direction of a court of competent jurisdiction.  Seller and Buyer undertake to hold Escrow Agent harmless from all claims for damages arising out of this Escrow Receipt and do hereby agree to indemnify Escrow Agent for all costs and expenses in connection with this escrow, including court costs and attorneys' fees, except for Escrow Agent's failure to account for the funds held hereunder, or acting in conflict with the terms hereof.

The fees and charges of the Escrow Agent shall be paid one-half by Seller and one-half by Buyer.

ESCROW AGENT:

FIRST AMERICAN TITLE INSURANCE COMPANY


By: _____
Its: _____

SELLER:

HUSTAD INVESTMENTS, LP,
a Minnesota limited partnership

By: Hustad Real Estate Company,
     a Minnesota corporation
Its:  General Partner


By:_____
Name:  Elisabeth R. Hustad
Its:  President

BUYER:

_____


By: _____
Name: _____
Its: _____

**EXHIBIT 3**
**DEVELOPMENT AGREEMENT**


TO BE FILED

**EXHIBIT 4**
**PLANNED UNIT DEVELOPMENT AGREEMENT**

TO BE FILED

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re: | **Substantively Consolidated Under**<br>**BKY 13-40789** |
| HUSTAD INVESTMENT CORPORATION, | BKY 13-40789 |
| HUSTAD REAL ESTATE COMPANY, | BKY 13-40786 |
| HUSTAD INVESTMENTS, LP, | BKY 13-40788 |
| Debtors. | Chapter 11 Cases |

---

### MEMORANDUM OF LAW

---

The Debtor submits this Memorandum in support of its Motion to Approve Bidding Procedures and Form of Asset Purchase Agreement for Sale of Maple Grove Residential Property Free and Clear of Interests. The facts pertaining to this Memorandum are set forth in Debtor's verified Motion.

### Applicable Legal Authority for Proposed Sale

Section 363 of the Bankruptcy Code provides that the Debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. §363(b). To approve the use, sale or lease of property outside the ordinary course of business, this court need only determine that the Debtor's decision is supported by "some articulated business justification." *See, e.g., Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also, Stephens Ind., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Abbott Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del. 1991).

Once the Debtor articulates a valid business justification "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johnson-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attached to a Debtor's management decisions.").

Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (in re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Accordingly, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefor. *See Schipper*, 933 F.2d at 515; *In re Lionel Corp.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169 at 179.

As explained in the Motion, Debtor has a sound business justification for selling the Real Property at this time. The sale is in the interests of creditors and equity security holders.

Under § 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    Such entity consents;

(3)    such interests is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)    such interests is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

-2-

Because section 363(f) is drafted in the disjunctive, the Debtor's satisfaction of any one of its

five requirements will be sufficient to permit the sale of the Assets free and clear of liens, claims and

other interests (collectively the "Interests").   BMO holds a mortgage on the Real Property.   The

Debtor is reasonably confident that it will obtain BMO's consent to the sale and will thereby satisfy

the requirements of §363(f)(2).[1]

Moreover, all holders of Interests can be compelled to accept a money satisfaction of such

Interests in legal or equitable proceedings in accordance with §363(f)(5).   Such legal or equitable

proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien

may be compelled to accept payment in satisfaction of its lien pursuant to 11 U.S.C. §1129(b)(2)(A).

Indeed, §1129(b)(2)(A) specifically allows a debtor in possession to sell property subject to a

lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any

claims and defenses the Debtor may possess with respect thereto.   The Debtor proposes that any

Interests in the Real Property attach to the proceeds of sale.

**WHEREFORE**, Debtor requests that the Court enter the relief requested in the Motion.

Dated:  April 16, 2013

RAVICH MEYER KIRKMAN
McGRATH NAUMAN & TANSEY,
A PROFESSIONAL ASSOCIATION

By  /e/  Michael L. Meyer (72527)
       Will R. Tansey (323056)

4545 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

ATTORNEYS FOR DEBTOR

---

1 To the extent that any other entity asserts a lien on the Assets, the Debtor requests approval of this Motion under
11 U.S.C. §363(f)(1) and (f)(3).

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                    **Substantively Consolidated Under**
                                                          **BKY 13-40789**

HUSTAD INVESTMENT CORPORATION,                            BKY 13-40789
HUSTAD REAL ESTATE COMPANY,                               BKY 13-40786
HUSTAD INVESTMENTS, LP,                                   BKY 13-40788

                    Debtors.                              Chapter 11 Cases

## UNSWORN CERTIFICATE OF SERVICE

I, Michael L. Meyer, declare under penalty of perjury that on April 16, 2013, copies of Debtors':

1.    Notice of Hearing and Motion to Approve Bidding Procedures and Form of Asset Purchase Agreement for Sale of Maple Grove Residential Property Free and Clear of Interests;
2.    Memorandum of Law;
3.    Proposed Order Approving Bidding Procedures and Form of Asset Purchase Agreement for Sale of Maple Grove Residential Property Free and Clear of Interests;

were served by sending to each party a copy thereof as noted on the attached Service List.

Dated:  April 16, 2013                          /e/  Will R. Tansey, 323056

{00136776 }

ELECTRONIC
HUSTAD INVESTMENT CORPORATION
ATTN  ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
HUSTAD REAL ESTATE COMPANY
ATTN  ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
HUSTAD INVESTMENTS LP
ATTN  ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

MICHAEL FADLOVICH
UNITED STATES TRUSTEE
1015 US COURTHOUSE
300 SOUTH FOURTH STREET
MINNEAPOLIS MN  55415

MINN DEPT OF REVENUE
COLLECTION ENFORCEMENT
551 BANKRUPTCY / P O 64447
ST PAUL MN 55164

INTERNAL REVENUE SERVICE
ATTN SPECIAL PROCEDURES
WELLS FARGO PL STOP 5700
30 EAST SEVENTH
ST PAUL MN 55101

IRS DISTRICT COUNSEL
650 GALTIER PLAZA
380 JACKSON STREET
ST PAUL MN 55101

US ATTORNEY
600 U S COURTHOUSE
300 SOUTH FOURTH STREET
MINNEAPOLIS MN 55415

ELECTRONIC
ESTATE OF WALLACE H HUSTAD
ATTN  CINDY UTTERBACK
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
TREK DEVELOPMENT
ATTN ELISABETH R HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
FREDRIKSON & BYRON P A
ATTN  JOHN KONECK
200 SOUTH SIXTH STREET  STE 4000
MINNEAPOLIS MN 55402

ELECTRONIC
ANTHONY OSTLUND BAER & LOUWAGIE
ATTN  CORY OLSON
90 SO SEVENTH STREET  STE 3600
MINNEAPOLIS MN 55402

ELECTRONIC
BASSFORD REMELE P A
ATTN  LEWIS A REMELE JR
33 SO SIXTH STREET  STE 3800
MINNEAPOLIS MN 55402

ELECTRONIC
ELISABETH HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
KRISTEN KUELBS
9543 GREY WIDGEON PLACE
EDEN PRAIRIE MN 55347

ELECTRONIC
ANDERSON ZURMUEHLEN CPAS
ATTN  CINDY UTTERBECK
828 GREAT NORTHERN BLVD
P O BOX 1040
HELENA MT 59624-1040

BLUE CROSS/BLUE SHIELD
P O BOX 64179
ST PAUL MN 55164

ELECTRONIC
MYTECH PARTNERS
ATTN  LYF WILDENBERG
2420 LONG LAKE ROAD
ST PAUL MN 55113

ELECTRONIC
LAW OFFICES OF JAY F COOK
ATTN  JAY F COOK
5150 N TAMIAMI TRAIL  STE 201
NAPLES FL 34103

CITY OF MAPLE GROVE
ATTN  KEN ASHFELD
P O BOX 1180
MAPLE GROVE MN 55311

ELECTRONIC
RLK INCORPORATED
ATTN  MARY GRAUNKE
6110 BLUE CIRCLE DRIVE  STE 10
MINNETONKA MN 55343

ELECTRONIC
DORSEY & WHITNEY
ATTN  JOE McLEOD
50 SO SIXTH STREET  STE 1500
MINNEAPOLIS MN 55402

ELECTRONIC
FRUTH JAMISON & ELSASS PLLC
ATTN DOUGLAS ELSASS
80 SO EIGHTH STREET  STE 3902
MINNEAPOLIS MN 55402

ELECTRONIC
SKOLNICK & SHIFF P A
ATTN  WILLIAM SKOLNICK
527 MARQUETTE AVE SO  STE 2100
MINNEAPOLIS MN 55402

ELECTRONIC
BMO HARRIS BANK N A
C/O B GURSTELLE / J McDONALD
BRIGGS AND MORGAN P A
80 SOUTH EIGHTH STREET  STE 2200
MINNEAPOLIS MN 55402

ELECTRONIC
RUTH K HUSTAD
10470 WHITETAIL CROSSING
EDEN PRAIRIE MN 55347

ELECTRONIC
RUTH K HUSTAD
C/O J KONECK / C CUTLER / S GIBBS
FREDRIKSON & BYRON P A
200 SOUTH SIXTH STREET  STE 4000
MINNEAPOLIS MN 55402

ELECTRONIC
CENTRAL BANK
C/O ORIN J KIPP
WILFORD GESKE & COOK PA
8425 SEASONS PARKWAY  STE 105
WOODBURY MN 55125-4393

ELECTRONIC
GELLER INDUSTRIES LLC
C/O TIMOTHY R GECK
GECK DUEA & OLSON PLLC
4770 WHITE BEAR PARKWAY  STE 100
WHITE BEAR LAKE MN 55110

ELECTRONIC
KELLI HUELER AND WALLACE HUSTAD
C/O AMY J SWEDBERG
MASLON EDELMAN BORMAN & BRAND
90 SOUTH SEVENTH STREET  STE 3300
MINNEAPOLIS MN 55402

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Substantively Consolidated Under BKY 13-40789** |
| HUSTAD INVESTMENT CORPORATION, | BKY 13-40789 |
| HUSTAD REAL ESTATE COMPANY, | BKY 13-40786 |
| HUSTAD INVESTMENTS, LP, | BKY 13-40788 |
| Debtors. | Chapter 11 Cases |

**ORDER APPROVING BIDDING PROCEDURES AND FORM OF
ASSET PURCHASE AGREEMENT FOR SALE OF MAPLE GROVE
RESIDENTIAL PROPERTY FREE AND CLEAR OF INTERESTS**

This matter came on for hearing on the motion of Debtor for the entry of an order authorizing and approving bidding procedures and form of asset purchase agreement for sale of Maple Grove residential property free and clear of liens.  Appearances were noted in the record. This Court having determined that granting relief requested in the motion is in the best interest of the Debtor, its estate, and creditors; it appearing that proper and adequate notice has been given; and after finding that good and sufficient cause for the requested relief appears upon the record herein; it is hereby

ORDERED:

1.      The Bidding Procedures and form of Purchase Agreement described in the motion are approved.

2.      The Debtor is authorized to enter into the Development Agreement and the Planned Unit Development Agreement in the form attached to the motions as Exhibits 3 and 4 respectively.

{00135691    }

**3.**      Notwithstanding Bankruptcy Rule 6004(h), this Order is effective immediately.


Dated:

_____
Kathleen H. Sanberg
United States Bankruptcy Court Judge